**In re LOOP HOSPITAL PARTNERSHIP, an Illinois Limited Partnership, Debtor.**

**Bankruptcy No. 83 B 4169.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Dec. 27, 1983.

Kerry B. Wolfe, Wolfe & Klein, and Donald L. Johnson, Marty J. Schwartz, Chicago, Ill., for creditor.

Ronald R. Peterson, Larry M. Wolfson, Catherine Steege, Jenner & Block, and J. Barton Kalish, Chicago, Ill., for debtor.

## MEMORANDUM AND ORDER

ROBERT L. EISEN, Bankruptcy Judge.

This matter came before the court on a motion by Marine National Exchange Bank (Creditor) to compel Loop Hospital Partnership (Debtor) to assume or reject an unexpired lease agreement (Agreement) under 11 U.S.C. Section 365. Creditor maintains that the agreement for hospital equipment is a true lease. In response, debtor asserts that the lease is a disguised security agreement for the conditional sale of the equipment and therefore not subject to a Section 365 motion. After considering the parties' pleadings and memoranda and applicable statutory case law, the court finds the agreement is a true lease for the equipment, not a secured transaction for a conditional sale. Therefore, the creditor's motion to compel the debtor to assume or reject the lease is granted and debtor is ordered to assume or reject said lease on or before February 10, 1984 at 10:00 a.m. at which time the court will conduct a status hearing thereon.

## FINDINGS OF FACT

1. On August 12, 1981 MarineBanc Leasing Company, Inc. and debtor entered into the agreement at issue and debtor took possession of certain hospital equipment. On August 31, 1981, MarineBanc Leasing Company, Inc. assigned its rights and interests in the agreement to the creditor.

2. Total monthly payments due under the agreement were $1,230.00 over a five year term.

3. Approximately three months into the arrangement, after November 12, 1981, the debtor discontinued making monthly payments. Consequently, on March 19, 1982 creditor invoked the acceleration clause and demanded the entire balance pursuant to paragraph 15(b) of the agreement.

4. By August 1982, the creditor had repossessed approximately half of the equipment, and said equipment was sold or released and debtor was credited with $137,-867.46.

5. Creditor filed suit against the debtor and certain individual partners in the United States District Court for the Northern District of Illinois, No. 82 C 2628, for damages as a result of debtor's default. Creditor also filed suit in the Circuit Court of Cook County, Illinois, No. 82 L 8603, for a writ of replevin to repossess the remaining equipment. Both proceedings have been stayed, pursuant to 11 U.S.C. Section 362 by the debtor's Chapter 11 proceeding before this court.

6. In pertinent part, the agreement, denominated a "Master Lease Agreement," does not expressly provide an option provision for the equipment's purchase or a renewal right after the original five year term. The equipment schedules show a zero in the box provided for renewal rent. Creditor has retained title and absolute right to the equipment (Agreement, ¶ 7). The debtor is required to return the equipment to the creditor upon expiration or prior termination of the agreement (Agreement, ¶ 8). The creditor disclaims all warranties (Agreement, ¶ 3) and retains the right to accelerate and declare all rent due upon a default by the debtor (Agreement, ¶ 15). The debtor must assume equipment expenses of any nature (Agreement, ¶ 10) and pay insurance costs (Agreement, ¶ 4), receive the equipment specially ordered from a third party supplier (Agreement, ¶ 5) and indemnify the creditor from all claims (Agreement, ¶ 11).

## DISCUSSION

The basic question the court must resolve is whether the agreement between the parties constitutes a true lease or a lease intended as security for the conditional sale of the equipment.

Leases intended as security are subject to Article 9 (Secured Transactions) and Article 2 (Sales) of the Uniform Commercial Code (UCC), while true leases are not. Additionally, lease are subject to the assumption or rejection provisions of Section 365 of the Bankruptcy Code while an action to obtain possession of goods subject to a security agreement must be brought in the form of a motion or complaint to modify the automatic stay under Section 362 of the Bankruptcy Code. It is therefore important to distinguish whether the agreement in question constitutes a true lease or a lease intended as security for a conditional sale.

In the 1940's the drafters of the UCC did not focus much attention on leases because the leasing market boom had not yet occurred. In the late 1950's certain tax rulings were issued favoring the use of leases over sales for certain individuals. See Hawkland, *The Impact of the Uniform Commercial Code on Equipment Leasing,* 1972 Univ. of Ill.Law Forum 446. As leasing has increased and commercial problems have multiplied, the courts have found only limited guidance from the UCC in resolving leasing questions. Generally, true leases cover the temporary use of property (commonly equipment) for a price and require the leased item's return to the lessor. Leases intended as security, however, are characterized by the obligation to pay the full purchase price because they are sales of equipment with a reservation of title to provide the security.

In a conditional sales agreement, the lessee-purchaser generally assumes the risks and obligations associated with the benefits of ownership: "rental" payments compensate the lessor-seller for his capital outlay plus interest and usually a profit by the end of the lease's term. Understandably, the lessee-purchaser expects to retain the leased equipment with no extra cost upon the

agreement's expiration. One common way these "leases" arrange for the transfer of title is with an option-to-purchase provision for one dollar or a minimal amount of consideration. However, where tax advantages require strict adherence to the lease format, parties generally omit an option provision for fear the instrument will be deemed a contract for sale. Such no-option "leases" require the lessee to return the equipment despite his posture as a buyer. See Coogan, *Leases of Equipment and some other Unconventional Security Devices: An Analysis of UCC Section 1–201(37) and Article 9,* 1973 Duke Law Journal, 909, 955–957. [Hereinafter cited as Coogan.]

There are no absolute standards by which to distinguish a true lease from a secured transaction, though many courts have earmarked persuasive facts as indicative of the parties' intentions. The problem of identifying and distinguishing the two arises when the parties designate the contract as a lease, but distribute the terms of ownership as if the parties were sellers and purchasers. Viewed broadly, the agreement in question before this court is just such a case: the parties have designated the contract as a lease but the terms of ownership bear a strong resemblance to a relationship where the parties are sellers and purchasers. While the debtor must assume equipment expenses, pay insurance costs and indemnify creditor from all claims, the debtor does not have the option to purchase the equipment at the end of the five year term and the contract specifically calls for the return of the equipment to the creditor. Therefore, the agreement includes many terms typically found in true leases as well as conditional sales agreements and a more specific inquiry is required to determine its true nature.

■ As in any contract, it is important to determine the parties' intentions. The intent of parties to a contract must be determined from the language of the whole instrument. Effect must be given to each word, clause or term; none should be rejected for lack of meaning or surplusage. *Nice Ball Bearing Co. v. Lescure,* 227 F.2d 118 (7th Cir.1955); *Lathrop v. Bell Federal Savings and Loan Association,* 68 Ill.2d 375, 12 Ill.Dec. 565, 370 N.E.2d 188 (1977).

■ Where essential elements of a sale are present, the transaction will constitute a sale even though it may have some features of some other form of transfer. See *Williston on Sales,* (Squillante & Fonseca, 4th Ed.1973). For example, although an agreement is denominated a lease, if the substantive provisions indicate it is in fact a sale, it will be deemed a sale. The parties cannot change the legal effect of an instrument simply by giving a name to it. *Szabo Food Service, Inc. of North Carolina v. Balentine's Inc.,* 15 UCC Rep.Serv. 170, 285 N.C. 452 (1974). The instrument may disguise actual intentions and therefore it is important to analyze beyond the document's face. (See *Hervey v. Locomotive Works,* 93 U.S. 664, 673, 23 L.Ed. 1003 where the court held that the lease form was used to "cover the real [sales] transaction.")

■ Section 1–201(37) of the UCC provides that in determining whether the transaction is "intended as security" reliance is to be placed upon "the facts of each case." Equipment leases contain numerous fact patterns. The UCC as a starting point provides some guidelines important to identifying a transaction. The two applicable provisions of the UCC are section 1–201(37) and 9–102. Section 9–102 which limits security interests to those created by contract reads in pertinent part:

(1) Except as otherwise provided in Section 9–104 on excluded transactions, this Article applies

(a) to any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts. . . .

Whereas Section 9–102 sets out the policy and coverage of Article 9 to security interests, only Section 1–201(37) helps identify when such interests exist. Specifically, Section 1–201(37) states:

Security interest means an interest in personal property or fixtures which se-

cures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2–401) is limited in effect to the reservation of a security interest. The term also includes any interest of a buyer of accounts or chattel paper which is subject to Article 9. The special property interest of a buyer of goods on identification of such goods to a contract for sale under Section 2–401 is not a security interest but a buyer may also acquire a security interest by complying with Article 9. Unless a lease or consignment is intended as security, reservation of title thereunder is not a security interest but a consignment is in any event subject to the provisions on consignment sales (Section 2–326). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease intended for security and (b) an agreement that upon compliance with the terms of the lease shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Section 1–201(37) has been paraphrased as requiring two basic elements for a security interest: (1) the lessee must be obligated to make rental payments roughly equivalent to the leased property's cost plus interest and (2) the lessor must lack a residual value in the leased property at the termination of the lease. *Williston on Sales* Section 6–8 (Squillante & Fonseca, 4th Ed.1973).

1. *Lessee's Obligation*

The first sentence of section 1–201(37) states the two elements uniformly required to create a security interest: A property interest and an obligation. The nature of the obligation effectively reveals the lessee's status. Unfortunately, the UCC does not articulate what kinds of obligations create a security interest. The Uniform Conditional Sales Act [UCSA], though superseded by the UCC, sheds light on the type of obligation necessary for a conditional

sale. In general, the UCSA treats a lessor as a conditional vendor where

(1) the purchaser-debtor is *obligated to pay an amount substantially equal to the purchase price;* and

(2) the purchaser-debtor thereby acquires, or has the option to acquire, the status of "owner" of the item conditionally sold. See UCSA Section 1(2) (emphasis added).

The obligation to make payments aggregating to the purchase price appears to be a necessary ingredient of a lease intended for security, but by itself is insufficient to create one. In order to find a security interest, the court must also find that the lessor possesses no economically meaningful residual value in the property at the term's end. This finding may be indicated by the existence of a nominal option price roughly equivalent to the fair market value of the leased property at the end of the term, or the lessee's consumption of the entire economic value of the property. In contrast, where the parties anticipated that the property would have significant market value at the time the option to acquire would be exercised, the lessor has a residual value in the property and a lease is indicated. See *In re Oak Manufacturing, Inc.,* 6 UCC Rep. Serv. 1273 (S.D.N.Y.1969).

2. *No Residual Value for the Lessor*

If the lessee becomes the owner of the property, or may exercise an option to purchase the property for nominal consideration at the term's end, then the lease is one "intended for security." Section 1–201(37) indicates that an option does not automatically create a security; however, a lease with an option to purchase for nominal or no additional consideration is a security interest. Therefore, an option must be analyzed for its true character: If the option price resembles the fair market price of the equipment, then the option is a real one; rental payments over the term of the agreement will compensate the lessor only for the use of the property. Thus, such an agreement is a lease. However, where the option price is nominal or substantially less than the fair market value of the equip-

ment, at the end of the term the option effectively acts as consideration for the passing of title from the lessor-seller to the lessee-purchaser; the rental payments will compensate the lessor for the cost, plus interest, of the property. Such a lease is a conditional sales agreement. See *Williston on Sales,* Section 6–8, p. 177 (Squillante & Fonseca, 4th Ed.1973).

Section 1–201(37) may be better understood by reference to its lineal predecessor, the UCSA, promulgated in 1923, which codified most of the pre-UCSA law in section 1(2):

> (1) any contract for the sale of goods under which possession is delivered to the buyer and the property in the goods is to vest in the buyer at a subsequent time upon the payment of part of all of the price, or upon the performance of any *other condition* or the happening of any contingency; or (2) any contract for the bailments or leasing of goods by which the bailee or lessee contracts to pay as compensation a ·sum substantially equivalent to the value of the goods and by which it is agreed that the bailee or lessee is bound to become or has the option of becoming the owner of such goods upon full compliance with the terms of the contract. (Emphasis added).

(See *Coogan* at 936–941 for the history of the UCC's incorporation and abbreviation of the UCSA). Under both the UCSA and UCC Section 1–20 (37) and case law, the lessee can "become the owner" of the equipment applicable without an express option, if it has paid as compensation a sum substantially equivalent to the value of the goods in the form of rental payments. In fact, the bankruptcy court for the Western District of Wisconsin in *In the Matter of Gehrke Enterprises,* 1 B.R. 647 (Bkrtcy. 1979) held that under those circumstances an implied option to purchase exists despite the lack of an express provision for one. By liberally construing the residual guaranty clause to be the lessee's right to ownership, the court found that certain leases were intended as security agreements. *Id.* at 652. The clause provided for the sale of the equipment to a third party, with lessee entitled to proceeds over the agreed amount

of $12,500.00, the anticipated fair market value, and liable for any deficiency if the third party were to pay less. The court held that the lessor's residual value in the property had shifted to the lessee who was entitled to the surplus and obligated for the deficiency upon the property's resale. *Id.* at 652.

■ Even where the facts are liberally construed to imply the existence of an option, however, the option price alone does not determine absolutely the lease's nature because it is possible to have an option price that is nominal in relation to the original cost of the. equipment but substantial in relation to its fair market value. See *In re Tulsa Port Warehouse Co., Inc.,* 4 B.R. 801 (D.C.N.D.Okl.1980). Since an absolute determination cannot be made on the presence or absence of an option provision, the fair market value of the equipment at the agreement's expiration becomes critical information. The presence of an option to acquire is only one manifestation of the equipment's resale value. If, in addition, the parties anticipate a particular value at the end of the agreement's term, then their original intent to lease or sell the equipment can be more realistically ascertained. It is this court's opinion that the express or implied option plus a nominal fair market value are both necessary to create a security interest.

In *UC Leasing, Inc. v. Laughlin,* 606 P.2d 167 (Nev.1980), the court simply added rental payments to the option price and concluded that since the sum equalled *the purchase* price of the property plus interest, the lessor did not anticipate retaining residual value at the agreement's end, the lessee acquired some sort of equity in the property and therefore, the lease was intended for security. Such computation and conclusion, however, neglects the possibility of the property having a market value at the *end of the term.* Although the rental payments may reimburse the lessor's total capital outlay plus interest, where the *property still* possesses value at the term's end, the lessor may very well have intended to create a true lease situation where he will get the property back at the term's end and sell it

for a substantial amount or refurbish and relet it.

Another theory by which courts have found leases to be disguised sales agreements is the economic sensibility approach. The key to this approach is again whether the option to purchase at term is for a substantial sum or a nominal amount in relation to the fair market value. If the option price resembles the actual fair market value of the property at term, then the rental was in fact compensation for use of the property and nothing more and the agreement was a true lease with a true option. However, if the option price is substantially less than the present fair market value then the lease has been deemed a mere cover for a conditional sale. *In re Washington Processing Co.,* 3 U.C.C. 475 (Bktcy.S.D.Cal.1966).

For example, in *Washington Processing,* the debtor "leased" a piece of equipment for 36 months. At the end of the term the property had a fair market value of approximately $24,000.00. The option to purchase, however, was for only $1,350.00. Under these circumstances, obviously the debtor would exercise the option to purchase. Therefore, the court concluded that the agreement contemplated by the parties had to be a conditional sale—economic sensibility would dictate that the lessee *must* exercise the option. Thus, the option was not "real" and the agreement was never meant to be anything but a sale.

The economic sensibility approach also dictates that the lessee becomes the owner of the property where its useful life is exhausted at the end of the agreement's term. For example, in the case of *In re Pomona Valley Inn,* 4 U.S.C. 893 (Bkrtcy.C.D.Cal. 1967), the court held that a lessor did not expect the return of "leased" equipment where the rental period would probably exceed the useful life of the equipment. Economic sensibility dictated that the "lease" was contemplated by the parties to be an agreement for sale of the equipment.

### 3. *Incidents of Ownership*

One final factor to consider in deciding whether an agreement is a true lease or a conditional sales agreement is ownership of the property, actual and implied. An agreement may state that the lessor retains title to the property at all times but may require the lessee to assume the burdens of ownership. Section 1–201(37) of the UCC states that the retention or reservation of title by the seller is limited to a security interest. Title retention, however, does not necessarily create a security interest, although title retention cannot create anything else but a security interest if it creates anything at all. Section 2–106 and 2–401 of the UCC indicates that a seller may retain title until the buyer's monetary obligations have been paid in full, a conditional vendor retains limited title and a lessor retains complete title. Therefore, title retention does not provide identification of the agreement's nature. One can certainly become the owner without acquiring title. Coogan at 964.

Some courts in order to determine if the lessor has shifted his residual value in the property to the lessee and thereby created a security agreement, have established for guidance a laundry list reciting which party holds various incidents of ownership. The most notable factors or incidents cited by the courts include:

1. Lessor's status as a financier, *In re Industro Transitor Corp.,* 14 UCC 522 (Bktcy.E.D.N.Y.1977);

2. The requirement that the lessee insure the goods in favor of the lessor for a value equal to the total rental payments, *WOCO v. Benjamin Franklin Corp.,* 20 UCC 1015 (D.N.H.1976), aff'd, 562 F.2d 1339 (1st Cir.1977);

3. Provisions that lessee must pay for taxes, repairs and maintenance, and default provisions allowing acceleration and resale, *National Equipment Rental v. Priority Electronics Corp.,* 435 F.Supp. 236 (E.D.N.Y.1977);

4. A required, substantial non-refundable deposit, *Service Corp. v. American Nat. Bank & Trust Co.,* 19 UCC 252 (D.N.J.1976);

5. Lessee's selection of goods from third party supplier, *McGalliard v. Liberty Leasing Co. of Alaska,* 534 P.2d 528;

6. The exclusion of warranties normally found in a lease, *WOCO v. Benjamin Franklin Corp.,* supra;

7. The goods are fixtures impractical to remove, *Meeker v. Fowler,* 35 Ill.App.3d 313, 318, 341 N.E.2d 412 (1976).

However, the court here cites these factors only in recognition that they have been mentioned by some courts. This list of factors is not exhaustive and no one factor alone conclusively creates a security agreement in the absence of an option or equity interest. In fact, it is unfortunate that the courts have relied on these so-called incidents or burdens of ownership. The factors are basically irrelevant as they can also appear in true leases, and merely add to the confusion in analyzing these cases. Burke, "Annual Survey—Secured Transactions," 34 Business Lawyer 1547, 1550–51. The UCC has an "abhorrence of secret liens." White and Summers, *Handbook of the Law Under the UCC,* Section 22–3 at 883 (2d Ed.1980). A better indicator of intended ownership is the parties' anticipation of the fair market value at the end of the agreement.

■ Applying all of the above to the case at hand, it is clear that the agreement in question has more aspects of a true lease than a security agreement. The controlling factors are that the debtor-lessee does not have any option to purchase the equipment at the end of the five year term and the creditor-lessor retains the property's residual value.

Not only is there a lack of express or implied option to purchase, the parties in fact underscored their intention to not provide for an option by marking "-O-" in the automatic-renewal-rent-box on the equipment schedules. (All schedules are incorporated into the agreement). Paragraph 2 of the agreement provides in part:

If any renewal rental is specified in a schedule, after its initial term, this lease shall automatically be renewed each year for a term of one year at such renewal rental. . . .

The key word here is "if" at the beginning of the sentence: If there is a renewal rental amount specified in the schedule, then the renewal becomes effective automatically at that amount. Where the renewal rate is zero, it is logical to conclude that the parties intended that there be no renewal. There is no consideration for a renewal right. Had the parties intended a renewal, the customary $1 could have been written into the schedule. The nominal amount of $1 would have alerted both the parties and the court to an enforceable right of renewal, or intended purchase option.

■ The court recognizes from the case law that an option may exist without an express provision in an agreement. An option may be implied where the lessee has paid for the value of the property through rental payments and thereby acquired some sort of equity interest in the property, or where the economic realities dictate the lessee's ultimate purchase. The court cannot imply an option here because the debtor has not established that its rental payments were intended to compensate the creditor for the equipment's fair market value in 1986, when the agreement would expire.

■ Moreover, the debtor cannot insist that economic sensibility would permit it to keep the property on the basis of an equity interest acquired by aggregate rental payments. There is no evidence to show that either party intended such an effect at the end of five years. Instead of proving an equity interest in the property, the debtor merely asserts that the total rental due exceeded the fair market value by approximately 12% per year at the time the agreement was executed. This percentage above the equipment's fair market value at the time the parties entered the contract is not necessarily a financing charge for a conditional sale, as debtor asserts, for two reasons. First, the 12% could easily represent a straight leasing fee for the estimated cost of the use and depreciation of rented property, *In re Alpha Creamery Co., Inc.,* 4 UCC 794 (Bktcy.W.D.Mich.1967). Second, determination of a financing charge requires a comparison of the rent to the equipment's

fair market value at the *end,* not the beginning, of the five year term.

The significant numbers to analyze are the option price and the equipment's fair market value at the end of the term. A correlation can then be made as to whether the option reflects a realistic purchase price or a nominal amount of consideration to officially pass title from the lessor to the lessee. As the option price in this case is zero and the agreement does not state the equipment's anticipated fair market value after five years and the creditor retains title and property rights, the court must conclude that no covert option exists; and further, that the creditor retains the residual value since there are no facts indicating an economic presumption of debtor's rights to the property. More specifically, the record does not contain the anticipated useful life of the equipment and there is no indication that the parties anticipated the equipment's useful life to end after five years. Instead, the fact that the agreement clearly required the debtor to return the property indicates that the creditor would then resell or relet the property to another party. Again, the agreement debtor signed clearly shows that the creditor intended to keep the property and not sell it exclusively to the debtor at the end of the lease term. In fact, the agreement clearly specifies in paragraph 8 that the debtor must return the equipment to the creditor upon expiration or prior termination of the lease and the equipment must be returned in the same condition as when received, except for reasonable wear and tear and depreciation relating to proper use. (See *In re Alpha Creamery Co., Inc.,* 4 UCC 794 (Bktcy.W.D. Mich.1967), where a relevant factor of a true lease is rental charges indicating an intention to compensate lessor for loss of value over the lease's term, due to aging, wear and obsolescence.)

█ Finally, the debtor maintains that a secured transaction, not a true lease, exists because the creditor has shifted the burdens or incidents of ownership to the debtor. Although certain ownership aspects are recognized by prevailing case law as reflecting a lease intended as security, they are neither conclusive nor primary, especially where there exists no express or implied option. All the facts of the case must be considered. Even the cases debtor cites in support of recognizing the debtor's incidents of ownership primarily rely upon a one dollar option price, or lessor's lack of residual property value, in determining the existence of a security agreement. Therefore, these cases use incidents of ownership to underscore, not prove, which party is favored by the economic reality of an agreement. *U.S. v. Fed. Ins. Co.,* 634 F.2d 1050, 1052–53 (10th Cir.1980). Additionally, the creditor's retention of title supports the parties' intentions to create a lease which provides neither an option nor a residual property right for the debtor. Consequently, an analysis of incidents of ownership is unnecessary.

█ In addition to concluding that the evidence reflects the parties' intentions to create a true lease, not a lease intended for security, it is important to recognize that the outcome of this case is not affected by the creditor's status, nor the agreement's recognition of the law of Wisconsin as the governing jurisdiction. First, contrary to the debtor's contentions, the National Bank Act, 12 U.S.C. Section 24, the Bank Holding Company Act of 1956, 12 U.S.C. Section 1843(c)(8) and the Banks and Banking Regulations, 12 C.F.R. Section 225.4(a)(6)(i)(a)–(f), allow the creditor to engage in true leasing, not just financing transactions. In leasing personal property, a bank must adhere to certain requirements, including the sale or release of property after expiration of the original term. However, there is no requirement that the original lessee have a right or option to become the property owner upon the agreement's expiration. In fact, the bank may hold the property for two years before selling or releasing it to any party it wants. 12 C.F.R. Section 225.-4(a)–(6)(i)(f).

█ Second, as to the potential conflict of laws problem, paragraph 22 of the agreement states that the equipment is to be located in Illinois and the agreement is to be governed by Wisconsin law. Section 1–105(1) of the UCC, and identical sections in

the Illinois and Wisconsin statutes, allow the parties to a contract to select the law by which the contract will be governed, provided the chosen forum bears an "appropriate relation" to the transaction. Ill.Rev.Stat., ch. 26 Section 1–105 (1981); Wisc.Stat. Section 401.105 (1981). However, under UCC sections 1–105, 9–102 and 9–103 and identical state provisions, the law of the state where the collateral is located controls repossession and resale, while the validity of a security interest is determined by the law of the jurisdiction where the security interest attached. *In re L.M.S. Associates, Inc.,* 33 UCC Rep.Serv. 1098 (Bktcy.S.D.Fla. 1982). Since neither the law of Illinois or Wisconsin clearly define a distinction between true leases and leases intended for security and neither party asserts the perfection or non-perfection of a security interest, the mere fact that the hospital equipment is in Illinois does not create a conflict of laws problem.

## CONCLUSION

It is concluded that the evidence reflects the parties' intention to create a true lease, not a lease intended as security for a financing. True leases supply the lessee with the temporary use of equipment; the rental price reflects the cost of the use and depreciation of the property over a particular time period. Ultimately, the lessee returns the property to the lessor at the end of the term. Leases intended as security, however, are characterized by the obligation to compensate the lessor-seller for his capital outlay plus interest, and usually profit, by the end of the lease's term. These transactions are sales of equipment with a reservation of title to provide the security. In regard to the creation of security interests, Section 1–201(37) of the UCC provides that an option or terms of the agreement allowing the lessee to become the property owner for nominal or no additional consideration does make the lease one intended for security. Case law supports this statutory guideline by emphasizing the existence of two basic elements to create a security interest: (1) the lessee must be obligated to make rental payments roughly equivalent to the leased property's cost plus interest and (2) the lessor must lack residual value in the leased property at the termination of the lease.

In the case before the court, the debtor has not established the creditor's lack of residual value in the leased property at the end of the five year period. Stated in the converse, the debtor has not sufficiently convinced this court that, under the agreement's terms, the debtor acquires the property's residual value. To determine who holds the residual value, the significant numbers to analyze are the option price and the fair market value at the end of the term.

An option is authentic if it resembles the fair market price of the equipment at the time the option is to be exercised because rental payments will have compensated the lessor only for use of the property. Thus, such agreement is a lease. Where the option is nominal or less than the fair market value of the equipment at the end of the term, the option is merely consideration for passing title to the lessee. Rental payments will have covered the purchase price plus interest and profit and such an agreement is a conditional sale.

The agreement in question reflects a lease because it does not expressly provide an option price, the debtor is denied a renewal after the five year term, the agreement does not state the anticipated fair market value at the term's end and the creditor retains title and all rights to the property. Under these facts, it is the opinion of the court that the creditor retains the property's residual value. Furthermore, these facts do not support an implication that either a covert option exists or that the debtor ultimately secures the property's residual value.

Case law does recognize that an implied option may exist where the lessee has acquired an equity interest in the property through aggregate rental payments or where the economic reality of the circumstances dictates the lessee's ultimate purchase. In the instant case, however, the court cannot imply the parties' intention to create an option on the basis of an acquired

equity interest (economic sensibility) because the evidence does not support such a conclusion. The debtor's obligations under the agreement which are described above as "incidents of ownership" do not conclusively create an equity interest in the property. Furthermore, the record is silent as to the anticipated useful life of the equipment and there is no suggestion that the parties expected the equipment's life to end after five years. Instead, the agreement supports the conclusion that the parties intended to create a true lease where rental payments compensate the creditor for loss of value over the five year term, due to aging, use and depreciation.

WHEREFORE, IT IS HEREBY ORDERED that the creditor's motion to compel the debtor to assume or reject the unexpired lease under 11 U.S.C. Section 365 is granted. Debtor is ordered to assume or reject said lease on or before February 10, 1984 at 10:00 a.m. at which time the court will conduct a status hearing thereon.