683 F.Supp. 719 (1988)
NATIONAL CAN SERVICES CORPORATION, et al., Plaintiffs,
v.
GATEWAY ALUMINUM COMPANY, INC., Defendant.
No. 86-1939C(3).
United States District Court, E.D. Missouri, E.D.
March 7, 1988.
*720 *721 Michael A. Kahn, Gallop, Johnson & Neuman, St. Louis, Mo., for plaintiffs.
Victor J. Klutho, John P. Brown, Klutho, Cody, Kilo & Flynn, St. Louis, Mo., for defendant.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court to determine the merits of plaintiffs' claims and defendant's counterclaim after a three-day trial before the Court sitting without a jury.
Pursuant to the Court's diversity jurisdiction and by their four-count complaint, plaintiffs contend defendant's[1] conduct broke certain agreements between the parties by which defendant (a) leased recycling equipment from plaintiffs, and (b) agreed to flatten, bale, and ship used aluminum beverage cans to aluminum mills for plaintiffs. Defendant urges (1) that one of the parties' agreements is in actuality security for the conditional sale of the relevant equipment and, as such, required notice by plaintiffs which plaintiffs failed properly to provide, and (2) that plaintiffs otherwise did not deal in good faith with defendant. Defendant's counterclaim seeks payments from plaintiff National Can Corporation that are allegedly due defendant pursuant to a written and an oral agreement between defendant and that plaintiff. During trial, plaintiffs stipulated that the amounts sought in the counterclaim could be set off against any judgment that may be entered in favor of plaintiffs.
Having considered the pleadings, trial testimony, exhibits, stipulations, and parties' memoranda, the Court makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiffs National Can Services Corporation ("NC Services") and its parent company, National Can Corporation ("National Can"), are corporations organized and existing under the laws of the State of Delaware with their principal places of business in the State of Illinois. National Can, through its Recycling Division, works with consumers, aluminum recyclers, and the aluminum recycling mills to recycle used aluminum beverage cans.
2. Defendant Gateway Aluminum Company, Inc. ("Gateway") is a corporation organized and existing under the laws of the State of Missouri with its principal place of business in St. Louis County, Missouri. Gateway is in the aluminum recycling business.
3. On or about May 28, 1982, plaintiff NC Services and defendant Gateway entered into a written agreement, entitled "Equipment Lease," whereby Gateway agreed to rent from NC Services three pieces of recycling equipment known as a baler, a conveyor, and a fifth wheel dumper, which then had a reported total cost of $75,061.26.
4. Pursuant to the Equipment Lease, defendant promised to pay NC Services quarterly rental payments of $4,916.57 each year throughout the term of the lease which ran from May 28, 1982, through May 27, 1987. Title to the equipment remained exclusively in lessor NC Services. During the term of the lease, the lessee Gateway (a) retained the obligation to maintain and repair the equipment; (b) assumed the risk of loss and damage to the equipment; and (c) paid all taxes (except income or gross receipt taxes due to rentals) on the equipment.
5. The equipment lease required that defendant return the equipment to NC Services upon termination or expiration of the lease subject to an option to purchase pursuant to Schedule 1 attached to and made a part of the Equipment Lease. In relevant part, that Schedule allowed defendant's purchase of the equipment at the equipment's "then fair market value,"[2] so long *722 as defendant was not in default under the Equipment Lease.
6. In the event of lessee Gateway's default, lessor NC Services was authorized
at its option, ... without notice of its election and without demand, [to] do either or both of the following, each of which is hereby authorized by Lessee.
(1) Proceed by appropriate court action or actions, either at law or in equity, to enforce performance by Lessee of the applicable covenants and terms of this Lease or to recover damages for the breach thereof;
(2) By notice in writing to Lessee, terminate this Lease and/or Lessee's rights of possession hereunder as to all or any part of the Equipment leased hereunder whereupon all right, title and interest of Lessee to or in the use of such Equipment shall terminate, and Lessor may, directly or by its agent, enter upon the premises of Lessee or other premises where the Equipment may be located, with or without process of law, and take possession thereof (any damages occasioned by such taking of possession being hereby expressly waived by Lessee) or may, at Lessor's option, require Lessee, at Lessee's expense, to deliver the Equipment F.O.B. to any point in the United States, Lessee waiving any further rights to possession of the Equipment in either such event. In the event of any such termination (i) Lessor shall be entitled to retain all rents and additional sums paid by Lessee hereunder in respect of all Equipment theretofore paid to or received by Lessor, including any such sums then in its possession which, had this Lease not been in default, would otherwise be payable to Lessee hereunder; (ii) Lessor may recover from Lessee all rents and additional sums accrued and unpaid under any of the terms hereof as of the date of termination and (iii) Lessor may recover from Lessee as liquidated damages, but not as penalty, a sum equal to the difference between:
(a) All rentals payable for the balance of the then unexpired term of this Lease, and
(b) The present value of all rentals payable for the balance of the then unexpired term of this Lease, discounted at an interest factor of ten percent (10%).
In addition to the foregoing remedies, Lessor shall be entitled to recover from Lessee any and all damages which Lessor shall sustain by reason of the occurrence of any such event of default, together with a reasonable sum for attorney's fees, and such expenses as shall be expended or incurred in the seizure, rental or sale of the Equipment or in the enforcement of any right or privilege hereunder.
The remedies provided in favor of Lessor in the event of default as herein-above set forth shall not be deemed to be exclusive, but shall be cumulative and shall be in addition to all other remedies in its favor existing at law, in equity or in bankruptcy and the election at any time to enforce any such remedies shall in no way bar the later enforcement from time to time of any other such remedies.
7. The Equipment Lease provided that it shall be governed by and construed under Illinois law.
8. As provided in the Equipment Lease, plaintiffs sought financing statements with respect to the covered equipment. The Equipment Lease and plaintiffs' testimony reveal that these statements were required because the equipment was moveable and was not located near plaintiffs. Through the financing statements, plaintiffs wanted to put others on notice of the relationship between the parties and the equipment.
9. On or about August 20, 1982, National Can entered into a written contract (the "Processing Agreement") with Gateway *723 concerning processing services to be performed by Gateway with respect to Used Beverage Containers ("UBC") purchased by National Can.
10. Pursuant to the terms of the Processing Agreement, National Can bought UBC from third parties who delivered the UBC to Gateway. National Can then paid Gateway a processing fee of $.04 per pound of UBC to flatten, bale, store, and, when the "processed material reache[d] boxcar quantities (minimum 60,000 lbs. per car)," load the UBC onto boxcars or trucks for shipment to a primary aluminum mill for National Can's account. While requiring defendant to record the weight shipment, the agreement expressly noted that shipments would be adjusted by the mills' receiving weight. This reliance on the receiving weight comports with industry practice. The agreement also required defendant to keep a record of UBC inventory and to provide routine updates on the inventory. The Processing Agreement did not expressly provide any remedies for any breach of the agreement.
11. While the Processing Agreement specified it would be for a term of two years, defendant continued to process and store inventory of UBC for plaintiff National Can. Thus, pursuant to the course of dealing and subsequent agreements and understandings between the parties and without dispute, this Processing Agreement remained in full force and effect up to the date of this lawsuit.
12. On or about January 1, 1984, Gateway entered into a five-year Joint Aluminum Can Recycling Agreement[3] (the "Recycling Agreement") with National Can, by the terms of which (a) Gateway agreed to lease from National Can various pieces of recycling equipment to be used at Gateway's satellite recycling centers located at various sites; (b) National Can agreed to purchase from Gateway "all used aluminum beverage cans (UBC) generated from the satellite centers, to be established by [Gateway] with the consent of [National Can];" (c) all purchased UBC were to be shipped by Gateway, with 80% of the price paid by National Can on notice of shipment and the remainder due in thirty days; (d) Gateway agreed to provide a monthly recap of pounds processed for each satellite center; and (e) Gateway agreed to produce a minimum volume of 15,000 pounds UBC each month from each agreed upon satellite center. At the termination or expiration of the Recycling Agreement, the covered equipment was to be returned to National Can.
13. The Recycling Agreement also provided that (a) Gateway "shall at no time make a commitment either to establish a satellite location or to provide equipment to any location until it consults with and receives written consent from [National Can];" and (b) when Gateway and National Can
reach agreement on specific equipment to be covered by this [Recycling] Agreement, [Gateway] shall sign a statement acknowledging the description of such equipment and the fact that such equipment is being leased by [Gateway] pursuant to the terms of this [Recycling] Agreement.
14. With respect to default, this Recycling Agreement specified that:
Should [Gateway] be in default under any provision of this [Recycling] Agreement, [National Can] shall have the right to terminate this [Recycling] Agreement immediately upon the giving of written notice to [Gateway] specifying the default, and [Gateway] shall thereupon return *724 to [National Can] all equipment then being leased hereunder.
Additionally, if Gateway failed to produce the monthly minimum volume from each satellite center, then this Agreement provided that National Can's Recycling Division "shall have the right to remove [the] equipment after mutually agreed efforts have been expended to increase volume." No other relief on default is specified in this agreement.
15. The Recycling Agreement specifically mentions six satellite centers.[4] In Schedule A attached to and made a part of the Recycling Agreement, the parties enumerated equipment covered by the agreement.[5] No written materials filed of record indicate that any other centers or equipment were covered by this agreement.
Plaintiffs urge the parties' conduct and oral agreements made other facilities and equipment fall within the terms of the Recycling Agreement. Defendant contends that no equipment or recycling centers, other than those expressly identified by the parties in writing, are encompassed by the Recycling Agreement. Defendant notes, however, it may have other equipment of plaintiffs due to separate arrangements to store temporarily or transport such equipment for plaintiffs.
Based on (a) the repeated, explicit requirements of the Recycling Agreement that any additional equipment, centers or facilities be identified and agreed upon in writing, and (b) the absence of record of any written identification of equipment or locations other than those to which the parties originally agreed, the Court finds the centers and equipment listed in the Recycling Agreement and Schedule A attached thereto are the only locations and equipment encompassed by this Agreement.
16. While plaintiffs claim defendant violated this Agreement (a) by failing to provide the monthly tonnage, and (b) by failing to ship to the mills all material subject to the Agreement and paid for by National Can, it is not clear of record what amount of UBC came from the satellite centers covered by the parties' Recycling Agreement. Thus, the Court makes no finding as to whether or not these requirements were violated by defendant.
17. In June 1984, defendant stopped making monthly recaps of pounds processed for National Can under the Recycling Agreement. This was a material breach of that Agreement, particularly in view of the fact defendant was processing these National Can cans as well as cans from others for which National Can paid only a processing fee.
18. On several occasions before 1985, Gateway defaulted under the Equipment Lease by failing to make required payments. On or about April 19, 1985, as a result of their discussions regarding Gateway's defaults, the parties entered into an Equipment Lease Modification Agreement ("Modification Agreement"). The Modification Agreement continued the term of the Equipment Lease until November 27, 1987; provided for monthly payments of *725 $1,720.00, rather than the payments of $4,916.57 due four times a year; and explicitly stated that "[a]s rent for the Equipment[,] Lessee [Gateway] agrees to pay Lessor aggregate rentals of $101,009.13." All other terms and provisions of the Equipment Lease remained "in full force and effect and unmodified."
19. Later in 1985, Gateway again failed to make required Equipment Lease payments. Plaintiff NC Services made repeated, unsuccessful demands for payment. In particular, plaintiffs sent a letter dated January 16, 1986, to defendant regarding defendant's failure "to make rental payments as required by the terms of the ... Equipment Lease." The letter notified Gateway that plaintiffs would take "whatever measures are necessary to collect the amounts due us" if plaintiffs did not receive payment for the full amount due within ten days. Plaintiffs did not clearly seek possession of the equipment at that time, but gave additional time to make required payments.
20. Between June 1984 and 1986, plaintiffs' representatives orally requested defendant to provide monthly recaps of UBC processed pursuant to the Processing Agreement. No such recaps were provided by defendant.
21. In February 1986, representatives of NC Services met in St. Louis, Missouri, with Mr. Bauer, president of Gateway, to seek resolution of Gateway's defaults. The parties reached an interim agreement whereby monies due Gateway from National Can under the Recycling Agreement would be used to offset the full amount of all past rents owed by Gateway to NC Services. Pursuant to this interim agreement, Gateway was again current as of March 1986 on its lease payments under the Equipment Lease.
22. However, Gateway fell into arrears under the Equipment Lease in May 1986. Representatives of NC Services contacted Gateway to demand payment of the rent due. Subsequently, as a result of a June 1986 meeting, the parties reportedly agreed to the following:
1. Gateway Aluminum will purchase the baler on their premises for $30,900.00. This purchase will be completed by July 1st, 1986.
2. Pricing [in the Recycling Agreement] will be revised to $0.01 below toll.
3. [Payment] [t]erms [of the Recycling Agreement] will be changed to95% upon receipt of Gateway invoice, remaining 5% in 30 days.
4. Gateway agrees to routinely ship [National Can] inventory until the outstanding balance is less than 30,000/lbs. Minimum shipment of [National Can] inventory per load will be 5,000/lbs.
5. All unused equipment will be returned to National Can.
6. National Can will purchase 100% of the UBC generated by Gateway.
Gateway was unable to obtain the money necessary for purchasing the baler, so NC Services continued to invoice defendant for lease payments on the equipment subject to the parties' Equipment Lease. Although defendant contests the July 1, 1986, deadline for purchasing the equipment, the record does not reflect that defendant was able and willing at any time since the June 1986 meeting to purchase the equipment for $30,900.00 or any other fair market value price. While defendant began making regular shipments of the inventory due National Can under the Processing Agreement, the shipments were 1,000 pounds rather than the 5,000 pounds set forth above. Defendant urges the 1,000 pound per shipment figure was the figure on which the parties agreed. Defendant does not, however, argue that it did not have in its inventory a large amount of UBC for which National Can had paid.
Until this June 1986 agreement that National Can would "purchase 100% of the UBC generated by Gateway," it is not clear to the Court that all UBC generated by Gateway was National Can's UBC. For instance, Gateway could have had satellite centers not covered by the parties' Recycling Agreement that generated UBC owned and processed by Gateway.
23. By the beginning of September 1986, Gateway was three months in arrears *726 on its Equipment Lease payments, and thus owed NC Services $5,160. Despite NC Services' repeated requests for payment, Gateway did not pay the $5,160. NC Services notified defendant by letter dated September 16, 1986, that it wanted full payment and possession of the equipment.
24. Gateway has not paid the balance due and owing to NC Services, and still owes $5,160[6] on the Equipment Lease.
25. The parties do not dispute that NC Services performed its obligations under the Equipment Lease.
26. Upon receiving neither payment nor possession of the equipment subject to the Equipment Lease, NC Services commenced this action on September 24, 1986, obtained an order of delivery in replevin from this Court, proceeded to trial, and incurred replevin bond costs of $4,475, rigger charges of $10,448, and certain attorney's fees.
27. Based on defendant's violation of the terms of the Recycling Agreement, on or about September 16, 1986, National Can terminated that Agreement by a letter in which National Can demanded return of the equipment provided by National Can pursuant to that Agreement. When the equipment was not returned, plaintiffs used these replevin proceedings to obtain various items of equipment. After such proceedings, the following equipment, which the Court finds is covered by the Recycling Agreement, remains outstanding and not recovered by plaintiffs:

 Book Standard Monthly
 Equipment Value Rental Rate
CC8 (Serial No. 199-G) $ 642.87 $ 58.00
CP200 (Serial No.
1563) 1,792.87 140.00
CP200 (Serial No.
1619) 1,678.58 140.00
CC8 (Serial No. 183-G) 642.87 58.00
CC8 (Serial No. 204-G) 642.87 58.00
CC8 (Serial No. 206-G) 642.87 58.00
CC8 (Serial No. 98-G) 385.73 58.00
CC6 (Serial No. 10) 458.94 34.00
CP200 (Serial No. 341-G) 4,495.32 140.00
CP200 (Serial No. 300-G) $ 3,516.40 $140.00
 __________ _______
 Total Book Value: $14,899.32
 Total Monthly Rent: $884.00

The Court finds other items of equipment plaintiffs report as not recovered are not clearly covered by the Recycling Agreement, i.e., three CP200s, serial nos. 1302, 246, and 1411; one CC8, serial no. 437; and two trailers.
28. The parties orally stipulated at trial that National Can owes defendant a total of $36,557.23 (the total due pursuant to Counts I and II of defendant's counter-claim), which amount may be offset against any amount found due to plaintiffs.
29. National Can performed all of its duties and obligations under the Processing Agreement.
30. It is undisputed that Gateway violated the Processing Agreement by failing to ship all of National Can's UBC to the primary aluminum mills on a timely basis. According to Gateway's own records, at the time the lawsuit was filed and the replevin proceedings were complete, Gateway had failed to account for approximately ten tons of National Can's UBC.
31. The only factual issue under the Processing Agreement is how many pounds of UBC Gateway still owes National Can.
32. Both Gateway and National Can kept a running inventory log of the pounds of UBC owned by National Can and covered by the Processing Agreement. The UBC poundage in Gateway's inventory log was based on the weights of each bale of UBC, as measured on Gateway's scale. The UBC poundage in National Can's inventory log was based on the receiving weights at the aluminum mill. Although National Can's inventory log included Gateway's shipping weights, National Can adjusted those weights (both up and down) based upon the final receiving weight at the mills.
33. The Court finds that National Can's inventory logs, as adjusted at trial, prevail. The Court bases this finding on the following grounds: (a) the Processing Agreement *727 expressly provides that the inventory records are to "be adjusted by Alcoa, Alcan or other [National Can] designated sites' receiving weights ..."; (b) Mr. Klotz of National Can testified without contradiction that the industry standard is that mill receiving weights prevail; and (c) Charles T. Waggoner, an employee of the Norfolk & Western Railway Company called as a witness by Gateway, testified (i) that mill receiving weights prevail in any weight dispute, and (ii) that the mills generally weigh the UBC on their own scales (thus not even relying on the railroad's shipping weights).
34. National Can's inventory records, as corrected at trial by the deletion of one shipment of 13,260 pounds and the addition of one shipment of 6,488 pounds, show that on the date suit was filed, Gateway was (or should have been) holding 79,365 pounds of National Can's UBC. National Can had purchased this UBC from third parties and had paid Gateway a fee for processing it.
35. Pursuant to replevin proceedings initiated in this action, National Can seized all of the UBC located at Gateway's facilities. According to National Can's records, it seized 26,840 pounds of UBC. In addition, there were two bales of unweighed UBC still in the baler at the time of replevin. Pursuant to the parties' pretrial stipulation, this Court finds that National Can seized a total of 27,730 pounds of UBC.
36. Subtracting the 27,730 pounds seized in replevin from the total inventory of 79,365 pounds leaves a balance of 51,635 pounds of UBC owed to National Can by Gateway.
37. It is undisputed that the market value of a pound of UBC was 52¢ at the time of trial. Accordingly, the market value of 51,635 pounds of UBC is $26,850.20.

Conclusions of Law
1. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a) in that this is a matter between citizens of different states and the amount in controversy exceeds the sum or value of $10,000.00, exclusive of interest and costs. Venue is proper in the Eastern District of Missouri.
2. By Counts I and II of the complaint, plaintiff NC Services seeks replevin and damages for defendant's untimely payments or nonpayments in violation of the Equipment Lease and the related Modification Agreement. Defendant urges that this lease is security for a conditional sales contract rather than a true lease, and as such required NC Services to give notice other than that given here.[7] To make this distinction, the Court must look to the instrument to determine the parties' rights and intentions. Of significance is the character of the parties' rights to purchase or retain the equipment either at expiration or at termination prior to expiration of the lease. As delineated by the Court in In re Loop Hosp. Partnership, 35 B.R. 929 (Bkrtcy.N.D.Ill.1983):
Generally, true leases cover the temporary use of property ... for a price and require the leased item's return to the lessor. Leases intended as security ... are characterized by the obligation to pay the full purchase price because they are sales of equipment with a reservation of title to provide the security.... The obligation to make payments aggregating to the purchase price appears to be a necessary ingredient of a lease intended for security, but by itself is insufficient to create one. In order to find a security interest, the court must also find that the lessor possesses no economically meaningful residual value in the property at the term's end....
If the lessee becomes the owner of the property, or may exercise an option to purchase the property for nominal consideration at the term's end, then the *728 lease is one "intended for security." ... If the option price resembles the fair market price of the equipment, then the option is a real one; rental payments over the term of the agreement will compensate the lessor only for the use of the property. Thus, such an agreement is a lease. However, where the option price is nominal or substantially less than the fair market value of the equipment, at the end of the term the option effectively acts as consideration for the passing of title from the lessor-seller to the lessee-purchaser; the rental payments will compensate the lessor for the cost, plus interest, of the property. Such a lease is a conditional sales agreement.
Id. at 931-34 (citations omitted). The Court may consider other factors, including: lessor's status as financier; lessee's insurance of the goods for the value of all payments; requirements that lessee pay taxes, repairs, and maintenance; default provisions allowing acceleration and resale; a substantial, nonrefundable deposit; lessee's selection of goods from third party supplier; exclusion of warranties; and the impracticality of moving fixtures that are the subject of the lease. Id. at 935-36. Such factors may, however, also appear in true leases. Id. at 936.
Upon consideration, the Court finds that the parties' agreement here is a true lease. While the lessee, Gateway, paid the taxes, paid maintenance and repair costs, and assumed the risk of loss of or damage to the equipment, the equipment was to be returned to NC Services at termination or expiration of the lease subject to an option to purchase. The option to purchase at the expiration of the agreement is for the equipment's then fair market value. The available record shows that prior to execution of their present lease agreement, the parties had discussed the possibility of Gateway's purchase of the equipment at the end of the lease at a price of $100.00, a nominal sum. This nominal purchase price, however, is not part of the parties' final agreement. Additionally, in June 1986 when the parties discussed the possible sale to defendant of the equipment subject to this agreement, the price was $30,900.00 a more than nominal sum and a sum close to the equipment's fair market value.
Defendant urges that NC Services' request for Uniform Commercial Code (UCC) financing statements with respect to the equipment which was the subject of the Equipment Lease indicates the agreement was not a true lease. The Court disagrees. Section 9-408 of the UCC as adopted by Illinois provides that a lessor of goods may file a financing statement, but the filing "shall not of itself be a factor in determining whether or not the ... lease is intended as security." Ill.Rev.Stat. ch. 26, para. 9-408. Additionally, as both the Equipment Lease and plaintiffs' testimony establish, the filing of the financing statement was an effort to notify others, who might be interested in the equipment, of the relationship between the equipment and these parties.
Thus, the Court finds the parties intended this agreement to be a true lease.
3. The Court further finds defendant violated the payment provisions of the Equipment Lease and the Modification Agreement by making untimely payments and by failing to make certain payments.
Defendant argues plaintiff NC Services improperly took possession of the equipment without adequate notice and absent good faith. Defendant's present argument is based on NC Services' acceptance of untimely payments and/or setoffs of amounts due NC Services with amounts plaintiffs owed defendant under the Recycling Agreement on occasions of nonpayment prior to the summer of 1986. Defendant urges that by this conduct and NC Services' failure earlier to file a lawsuit regarding defendant's payment problems, plaintiff NC Services waived its contractual rights.
Under Illinois law, waiver "is the ... intentional relinquishment of a known right. There must be both knowledge of the existence of the right and an intention to relinquish it." Pantle v. Industrial Comm., 61 Ill.2d 365, 335 N.E.2d 491, 496 (1975) (citations omitted); John Kubinski & Sons, Inc. v. Dockside Dev. Corp., 33 *729 Ill.App.3d 1015, 339 N.E.2d 529, 533-34 (1975). The Court concludes that Gateway has not met its burden of establishing a waiver. Although Gateway was admittedly in default on several occasions before NC Services filed suit, NC Services never relinquished any of its known rights under the contract. On the contrary, NC Services (a) made repeated demands, orally and in writing, that Gateway fulfill its obligations under the Equipment Lease; (b) met with Gateway on several occasions concerning its defaults; and (c) insisted on full compliance with the contract. That NC Services attempted to reach an amicable resolution of its problems with Gateway should not constitute a waiver. As the court held in Kubinski, "to hold that [plaintiff] should have declared an immediate forfeiture ... would defeat the public policy that encourages the extrajudicial resolution of disagreements." Kubinski, supra, 339 N.E. 2d at 534. Here, too, NC Services should not be adversely affected by its repeated extrajudicial efforts to resolve amicably its dispute with Gateway. Accordingly, the Court concludes that NC Services has not intentionally relinquished or waived any of its rights under the Equipment Lease.
4. As to the reasonableness of the termination notice, the Court finds the September 1986 letter notice proper under the circumstances. In particular, the Court notes the parties' June 1986 efforts to resolve their disputes (for instance, by sale of the equipment to defendant) evinced efforts to terminate this agreement. Defendant should at that time have been aware of plaintiffs' dissatisfaction with the ongoing delays in payments and of the potential for termination of the lease. The September 1986 termination letter was, therefore, not unreasonable or unexpected.
5. Based on the foregoing, the Court concludes that as of the seizure on September 26, 1986, plaintiff NC Services is entitled to possession of the equipment covered by the parties' Equipment Lease. Thus, under Count I, the replevin and repossession were proper.
6. Under Count II, the Court concludes that plaintiff NC Services is entitled to recover damages under the Equipment Lease. Those damages include (a) lease payments totalling $5,160.00 ($1,720.00 per month for July, August, and September 1986); (b) interest on those lease payments totalling $1,342.40 ($77.40 per month multiplied by seventeen months for the period September 26, 1986, to February 26, 1988, plus $2.66 per day for ten days for the period February 26, 1988, through March 7, 1988); (c) liquidated damages of $2,408.00 ($24,080.00 being the total of $1,720.00 per month multiplied by fourteen months, less $21,672.00, the total discounted by ten percent); (d) replevin bond costs of $4,475.00; (e) rigger charges of $10,448.00; and (f) taxable costs. While the Court will award plaintiff NC Services attorney's fees for services rendered by its counsel on Counts I and II of the complaint, the amount of attorney's fees remains under consideration. Thus, on Count II, NC Services will be awarded $23,833.40 plus taxable costs and reasonable attorney's fees.
7. In Count III, plaintiff National Can alleges defendant violated the Recycling Agreement and seeks replevin of the equipment leased under that agreement or damages for equipment not returned. The Court concludes that Gateway violated the Recycling Agreement by not providing monthly recaps of amounts processed at each covered center. Additionally, the Court finds defendant has not returned all of the equipment leased thereunder after reasonable notice and demand. Plaintiff National Can properly took possession of equipment in defendant's possession that was covered by the agreement. Gateway's breach of the Recycling Agreement has caused National Can to suffer damages in the amount of the fair market value of the equipment leased to Gateway but not returned to National Can, plus the lost revenues (rents) that could have been earned during the seventeen months Gateway has held the equipment. The fair market value of this equipment is $14,899.32, which amount defendant shall pay to National Can; unless, as soon as possible and not later than ten days from the date of this order, defendant returns to National Can *730 the outstanding items of equipment the Court finds are covered by the Recycling Agreement. To date, the lost rents total $15,332.80 ($884.00 per month multiplied by seventeen months, plus $304.80 for the ten day period from February 26 to March 7, 1988).
8. In Count IV, plaintiff National Can alleges breach of the Processing Agreement and seeks replevin of the UBC or damages for those UBC not recovered. The Court concludes that Gateway violated the Processing Agreement by not delivering to the mills certain UBC for which National Can had paid defendant a processing fee, and that National Can has suffered damages as a result of that breach. Furthermore, National Can was entitled to possession of the 27,730 pounds of UBC seized on September 26, 1987. National Can has been damaged in the amount of $26,850.20, this representing the market value (at 52¢ per pound) of the 51,635 pounds of UBC not returned or otherwise delivered to National Can by Gateway.
9. In all counts, plaintiffs seek an award of attorney's fees in an itemized amount totalling $14,915.30 for services rendered in this case by plaintiffs' counsel from October 1986 through June 1987. The Court finds, however, that only the Equipment Lease provides for such an award. Thus, the Court will require further substantiation of this request for services rendered in this case by plaintiff NC Services' counsel, with respect to Counts I and II only.
10. The parties stipulated that the amount defendant seeks in Counts I and II of its counterclaim, a total of $36,557.23 ($31,159.15 on Count I and $5,398.08 on Count II), may be set off against any amount defendant owes plaintiffs on plaintiffs' claims herein.
After careful consideration, the Court will enter judgment in favor of plaintiff NC Services on Counts I and II of the complaint; in favor of plaintiff National Can on Counts III and IV of the complaint; and in favor of defendant on Counts I and II of the counterclaim, with the total judgment on defendant's counterclaim set off against the total judgment on plaintiffs' complaint. The total damages awarded is:

$23,833.40 to NC Services on Count II
 15,332.80 to National Can on Count III
 for lost rents (this does not
 include the $14,899.32 amount
 awarded if defendant does not
 return certain equipment)
 26,850.20 to National Can on Count IV
__________
$76,016.40
-36,557.23 to Gateway on Counts I and II
 of its counterclaim
__________
$39,459.17 in favor of plaintiffs, plus attorney's
 fees on Counts I and
 II; and, if the outstanding
 equipment is not returned, an
 additional $14,899.32 to National
 Can on Count III.

ORDER
A memorandum dated this day is hereby incorporated into and made a part of this order.
IT IS HEREBY ORDERED that, with respect to Counts I, III, and IV of plaintiffs' complaint, the order of delivery in replevin is made final and plaintiffs are declared properly in possession of (a) equipment falling within the terms of the Equipment Lease and Recycling Agreement; and (b) used beverage containers falling within the terms of the Processing Agreement that were seized pursuant to the order of delivery in replevin.
IT IS HEREBY FURTHER ORDERED that, on Count II of plaintiffs' complaint, judgment shall be entered in favor of plaintiff NC Services in the amount of $23,833.40, plus reasonable attorney's fees and taxable costs.
IT IS HEREBY FURTHER ORDERED that on Count III of plaintiffs' complaint, judgment shall be entered in favor of plaintiff National Can in the amount of $15,332.80 for rent due on certain equipment not now in National Can's possession and declaring National Can entitled to either possession of the following items of equipment as soon as possible, and not later than ten days from the date of this order:
 CC8 (Serial No. 199-G)
 CP200 (Serial No. 1563)
 CP200 (Serial No. 1619)
 CC8 (Serial No. 183-G)
 CC8 (Serial No. 204-G)
 CC8 (Serial No. 206-G)
*731
 CC8 (Serial No. 98-G)
 CC6 (Serial No. 10)
 CP200 (Serial No. 341-G)
 CP200 (Serial No. 300-G)
or $14,899.32 in damages related to that equipment, plus taxable costs.
IT IS HEREBY FURTHER ORDERED that, on Count IV of plaintiffs' complaint, judgment shall be entered in favor of plaintiff National Can in the amount of $26,850.20, plus taxable costs.
IT IS HEREBY FURTHER ORDERED that on Counts I and II of defendant's counterclaim, judgment shall be entered in favor of defendant and against plaintiff National Can in the total amount of $36,557.23 (which amount shall be set off against the amounts defendant owes plaintiffs on Counts II through IV of plaintiffs' complaint), plus taxable costs.
IT IS HEREBY FURTHER ORDERED that on or before March 28, 1988, plaintiff NC Services shall file an itemization, including supporting documentation, of attorney's fees incurred for services rendered on behalf of this plaintiff with respect to Counts I and II of plaintiffs' complaint only.
IT IS HEREBY FURTHER ORDERED that on or before April 8, 1988, defendant shall file its response (no longer than ten pages) to plaintiff NC Services' materials supporting its fee request.
NOTES
[1] Pursuant to stipulation of the parties, on July 6, 1987, the Court dismissed from this lawsuit all defendants except Gateway Aluminum Company, Inc.
[2] There is no dispute that at one time, the parties may have agreed to enter into a sales agreement allowing the purchase of the equipment at the end of the agreement's term for a total price of $100. Despite any such earlier agreement, the agreement under which both parties have proceeded provides for periodic lease payments and a purchase, if any, at the equipment's fair market value at the end of the lease. When the parties subsequently considered the purchase by defendant of the baler, conveyor, and fifth wheel dumper (the equipment subject to the agreement), the price under consideration was approximately $30,000, an amount much greater than $100, and an amount close to the equipment's fair market value at that time.
[3] Paragraph 13 of the Recycling Agreement states that it:

(a) supersedes all prior and contemporaneous Agreements between the parties, (b) may not be modified except by a written document signed by both parties, (c) is binding on the heirs, administrators, successors and assigns of the parties hereto, and (d) constitutes the entire agreement between the parties as to the subject matter hereof.
With respect to paragraph 13(a), the Court does not construe that language to encompass the Equipment Lease or Processing Agreement between the parties. Neither party contended at trial that the Recycling Agreement was their only agreement, and the parties' conduct throughout their relationship indicated they understood these agreements were independent of each other.
[4] Those satellite centers are: Gateway Recycling # 1; Scrap Metal Market; Morrimet, Inc.; Lewis Salvage Company; St. Charles Scrap Metal and Auto Parts, Inc.; and Metro Metal Recyclers, Inc.
[5] The specified equipment was:

 Delivery
Type Equipment Date Serial Number
CC-8 /81 CC-199-G
CC-8 4/24/81 CC-138-G
CP-200 5/22/81 CP-1563
CP-200 7/27/81 CP-1619
CC-8 7/13/81 CC-183-G
Dump Blower 9/11/81 BD-170
CP-50 9/30/81 CP-50/93
CP-200 11/23/81 CP-1759
CP-200 11/23/81 CP-1760
CC-8 1/2/82 CC-262
CC-8 1/2/82 CC-263
CP-150 Mobile 1/26/82 021
Scoop Bucket 3/16/82 009-G
CC-8 3/11/82 CC-206-G
CC-8 3/11/82 CC-204-G
CP-200 /82 CP-1384
CC-8 /82 CC-98-G
CC-8 6/14/82 CC-094-G
CC-6 7/22/82 CC-009
CC-6 7/22/82 CC-010
CP-300 7/22/82 CP-068
CP-300 8/5/82 CP-078
CP-200 10/83 CP-341-G
CP-200 11/83 CP-300-G

[6] Gateway made one monthly payment in September 1986. Gateway, however, did not make the payment due in September 1986. Thus, Gateway owes a total of $5,160 for payments due under the Equipment Lease.
[7] While certain requirements of the Uniform Commercial Code (UCC) as adopted by Illinois may apply to an equipment lease, see Walter E. Heller & Co. v. Convalescent Home of the First Church, 49 Ill.App.3d 213, 8 Ill.Dec. 823, 365 N.E.2d 1285 (1977) (finding certain provisions of Article 2 of the UCC applicable to equipment leases) as well as to secured transactions or sales contracts, the distinction between a lease and the latter may affect the extent of the relief available to plaintiff NC Services.