**In re ASPEN IMPRESSIONS, INC., Debtor.**

**Adv. No. 88–11141F.**

United States Bankruptcy Court, E.D. Pennsylvania.

Jan. 13, 1989.

John F. Murphy, Doylestown, Pa., and Walter J. Greenhalgh, Kleinberg, Moroney, Masterson and Schachter, Millburn, N.J., for the movant, Provident Sav. Bank.

Anthony J. Pasquariello, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, Pa., for debtor, Aspen Impressions.

Mark A. Gittelman, Blank, Rome, Cominsky & McCauley, Philadelphia, Pa., for Bucks County Bank & Trust Co.

## MEMORANDUM OPINION

BRUCE I. FOX, Bankruptcy Judge:

I have before me a motion by Provident Savings Bank for determination of priority among encumbrance holders, for relief from the automatic stay in the chapter 11 case,[1] and to compel payment of an administrative claim. The motion is challenged

---

1. As counsel for Provident agreed at the hearing in this contested matter, the motion for relief from the stay to obtain possession of the equipment was made moot by the sale of this asset, as will be discussed below.

by Bucks County Bank and Trust, a secured creditor.[2] In dispute are the proceeds of a sale of equipment from the debtor's estate, which proceeds are currently being held in escrow pending resolution of this dispute. Provident's argument presents alternate theories in support of its motion: first, that the subject document entitled "Equipment Lease" is a true lease, as opposed to a security agreement for sale[3]; second, should I find that the document represents a security agreement, the movant instead argues that it holds a purchase money security interest, which was duly perfected in a way to give it priority over Bucks County Bank.

## I.

At the hearing the debtor's president, John M. Sisk, testified that Aspen Impressions attempted to purchase a particular printing press from its manufacturer, Didde Graphics, in November, 1985. After various negotiations, Didde Graphics declined to sell its press to Aspen Impressions, Inc. (the debtor probably not having sufficient cash and requesting a financing arrangement from the seller, to which Didde did not agree). A description of the press sought to be purchased and its price is found in the document "Machine Order & Contract," dated November 15, 1985, which was signed by a Didde salesman and John Sisk, for Aspen Data Graphics, Inc. and which was offered into evidence.[4] *See* Exhibit B–6.

Mr. Sisk further testified that, upon the failure of his negotiations with Didde Graphics, he entered into an agreement with an entity known as High Tech Funding, Inc. (Ex. P–3), which agreement is denominated a "lease." This document identifies Aspen Impressions, Inc. as the lessee of one printing press, serial number 410–0012, the supplier being Didde Graphics.[5] The lease was signed by the lessor, High Tech, and by Sisk for the debtor; it is dated April 15, 1986. The "Equipment Lease Schedule" states that the duration of the lease is 84 months, the monthly rent payment being $8,355.00 (with two monthly payments due in advance). Thus, $701,820.00 would have been paid by the end of this seven year payment schedule.

Exhibit P–4, an "Invoice revised (3–19–86)" by Didde Graphics, evinces a sale to High Tech Funding of a printing press, serial number 410–0012. This invoice calls for shipment to Aspen Data Graphics on March 17, 1986. The unit price of the press is listed as $409,600.00. Advance payments of $40,112.50 had been received by Didde; the payment terms for the balance are undisclosed by the invoice.

On the same day that High Tech signed its lease agreement with the debtor it assigned that lease to Provident; testimony showed that Provident "bought the lease [from High Tech] and gave them money for it." [N.T. at 14, 17].

Thereafter, on April 23, 1986, Bucks County Bank made loans and advances and extensions of credit to the debtor. To secure these obligations the debtor granted Bucks County Bank a security interest in, among other things, the debtor's existing and future equipment and machinery. (Ex. B–4.) Bucks County Bank filed a UCC–1 financing statement on May 2, 1986 with the Secretary of the Commonwealth of Pennsylvania perfecting this security interest; another UCC–1 statement concerning this security interest was filed on May 5,

---

**2.** An objection to Provident's motion was filed by Garrett–Buchanan Company, a secured creditor of Aspen Impressions, Inc. with security interests in, among other things, "all existing and future equipment of the debtor." Objection of Garrett–Buchanan Company, ¶ 1; Exhibit A attached thereto. Garrett–Buchanan did not participate in the hearing on this motion; nor did it submit a memorandum of law in support of its objection.

**3.** The parties agree that if it is a true lease, the movant would be entitled to the proceeds.

**4.** This purported contract calls for the sale of one printing press, serial number 410–0012, model or part number SF225. Shipment was to occur during the week of February 9, 1986; the unit price of the printing press is listed as $280,350.00. Charges for options to the standard unit are listed in the amount of $85,775.00; thus, the total contract price is $366,125.00.

**5.** It is clear that this agreement involves the same piece of equipment identified in Ex. B–6.

1986 with the Prothonotary of Montgomery County, Pa. (Exs. B–3 and B–5.) Provident, as assignee of High Tech, filed a financing statement covering the subject printing press against the debtor with the Commonwealth on April 25, 1986, (Ex. P–2); it also filed, on May 5, 1986, a statement concerning this property with the Prothonotary of Montgomery County, Pa. (Ex. P–1.)

The debtor filed its petition in bankruptcy under chapter 11 on April 4, 1988. The subject press was sold at auction for, approximately, $180,000.00. Bucks County Bank is currently holding these funds in escrow, pending resolution of the instant controversy.

## II.

The initial question posed is whether the "lease" agreement between High Tech and the debtor, which was subsequently (if not simultaneously) assigned by High Tech to Provident, is a true lease or a lease intended as security for the conditional sale of the equipment. A brief review of the distinction between leases and conditional sales contracts is thus in order.

■ Generally, true leases cover the temporary lease of property for a price, and require the leased item's return to the lessor. Leases intended as security, however, are conditional sales of equipment with a reservation of title to provide security. "In a conditional sales agreement, the lessee-purchaser generally assumes the risks and obligations associated with the benefits of ownership; 'rental' payments compensate the lessor-seller for the capital outlay plus interest and usually a profit by the end of the lease's term." *In re Loop*

*Hospital Partnership*, 35 B.R. 929, 931 (Bankr.N.D.Ill.1983). *See also, e.g., In re Butcher Boy Meat Market, Inc.*, 29 U.C.C. Rep.Serv. 649 (Bankr.E.D.Pa.1980); *In re Falco Products Co.*, 5 U.C.C.Rep.Serv. 264 (Bankr.E.D.Pa.1968). If it is determined that the instant agreement is a true lease, then Provident retains a reversionary ownership interest in the press and is entitled to the proceeds of the sale of that equipment. *See In re Pacific Express, Inc.*, 780 F.2d 1482, 1484 (9th Cir.1986).

■ In determining whether the lease agreement is "intended as security," reliance is to be placed, according to Section 1–201(37) of the Uniform Commercial Code, upon "the facts of each case." This section, codified by the Commonwealth of Pennsylvania at 13 Pa.C.S.A. § 1201,[6] helps identify when such a security interest exists. Specifically, the statute provides:

> Whether a lease is intended as security is to be determined by the facts of each case; however:
>
> (1) the inclusion of an option to purchase does not of itself make the lease one intended for security; and
>
> (2) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.[7]

This section indicates that while an express option to buy does not automatically create a security interest, a lease with an option to purchase for nominal or no additional consideration creates one as a matter of law. *See In re Ram Mfg., Inc.*, 45 B.R.

---

6. The determination of whether the instrument is a security agreement rather than a lease must be determined by reference to applicable state or local law. H.R.Rep. No. 595, 95th Cong., 1st Sess. 313–314; *In re Sprecher Bros. Livestock & Grain, Ltd.*, 58 B.R. 408 (Bankr.D.S.D.1986); *In re Cook*, 52 B.R. 558 (Bankr.D.N.D.1985). *See also Matter of Fashion Optical, Ltd.*, 653 F.2d 1385, 1389 (10th Cir.1981).

7. This language of the Code describes what was formerly known in Pennsylvania as a bailment lease, a security device by which one desiring to purchase an article of property, but not wishing

to pay for it immediately, could secure possession of it with the right to use it as long as the rental was paid, and with the further right to become the owner, upon completing the installment payments, by the payment of an additional, nominal sum. *In re Wheatland Electric Products Co.*, 237 F.Supp. 820, 821 (W.D.Pa. 1964); *In re Robinson*, 40 F.Supp. 320 (E.D.Pa. 1941), *aff'd*, 122 F.2d 336, *cert. denied*, 314 U.S. 686, 62 S.Ct. 297, 86 L.Ed. 549 (1941); *General Motors Acceptance Corp. v. Hartman*, 114 Pa.Super. 544, 174 A. 795 (1934).

663 (Bankr.E.D.Pa.1985); *aff'd in relevant part*, 56 B.R. 769 (E.D.Pa.1985); *vacated on other grounds*, Nos. 86–1057, 86–1058, 86–1059, 86–1089, 86–1090, 86–1091, slip op. at 3, 8 (3d Cir.1986)[802 F.2d 448 (table)]; *In re United Nesco Container Corp.*, 47 B.R. 230 (Bankr.E.D.Pa.1985); *In re Butcher Boy Meat Market, Inc.*; *In re Universal Medical Services, Inc.*, 8 U.C.C. Rep.Serv. 614 (Bankr.E.D.Pa.1970).

The agreement currently under review, however, contains no option to purchase; indeed, the document expressly denies the lessee the option to buy the equipment. *See* Ex. P–3, paragraph XXX ("lessee shall have no option to purchase or otherwise acquire title or ownership of any of the equipment and shall have only the right to use the same under and subject to the terms and provisions of the lease"). Thus, the agreement does not conform to either statutory subdivision cited above, and its character must be determined by examining the "facts of [this] case." 13 Pa.C.S. A. § 1201.

### III.

■ It is generally agreed that, just as the inclusion of a purchase option in a lease does not, of itself, imply a secured installment sale, the exclusion of one does not automatically imply a true lease. *See, e.g., In re Tulsa Port Warehouse Co.*, 4 B.R. 801 (N.D.Okla.1980), *aff'd.*, 690 F.2d 809, 811 (10th Cir.1982); *Matter of Fashion Optical, Ltd.*, 653 F.2d at 1389; *Matter of Tillery*, 571 F.2d 1361, 1366 (5th Cir.1978); *Leasing Service Corp. v. National Bank and Trust Co.*, 19 U.C.C. 252, 259 (D.N.J. 1976); *In re Mariner Communications, Inc.*, 76 B.R. 242, 245 (Bankr.D.Mass.1987). Thus, even though nothing in the agreement may permit purchase at nominal consideration, a security interest nonetheless may be found. *In re Pacific Express, Inc.*, 780 F.2d at 1485; *Matter of Fashion Optical, Ltd.*, 653 F.2d at 1389; 13 Pa.C.S.A. § 1201. As the UCC does not create an absolute standard by which to categorize a "no-option" instrument, some courts have earmarked persuasive facts as indicative of the parties' intentions, and hence revealing the true character of the instrument. I am persuaded that the better analysis distinguishes true leases from security interests by examining whether there is a realistic residual value in the leased property upon the conclusion of the contract.

■ Above I noted that the mere existence of a purchase option is not dispositive of this question. The price at which a purchase option may be exercised is subject to judicial scrutiny, as this sum must be of "nominal" consideration. Where the option price is nominal or substantially less than the fair market value of the equipment at the end of the contract's term, the option effectively acts as consideration for the passing of title from the lessor-seller to the lessee-purchaser; such a lease is a conditional sales agreement. *See, e.g., In re Wheatland Electric Products Co.*, 237 F.Supp. at 822; *In re Beker Industries Corp.*, 69 B.R. 937, 941 (Bankr.S.D.N.Y. 1987); *In re Loop Hosp. Partnership*, 35 B.R. at 933–934. *See also*, White & Summers, *Handbook & the Law Under the Uniform Commercial Code*, 881 (2d ed. 1980) ("*White and Summers*") ("if the option price amounts to 25% (or more) of the total list price, then it would appear that the lessee has been paying true rent rather than 'building up an equity,' and it would not follow that the only sensible course for him would be to exercise his option."). The more nominal the purchase option (relative to the fair market value at the time of exercise) or the more favorable the exercise terms, the more likely is the conclusion that the lease was really one intended to accomplish the transfer of a title interest. Naples, *A Review and Analysis of the New Article 2–A Leases Amendment to The UCC and Its Impact on Secured Creditors, Equipment and Finance Lessors*, 93 Com.L.J. 342, 348 (Fall 1988) ("*Naples*"). *See also, e.g., In re Wheatland Electric Products Co.*, 237 F.Supp. at 820; *In re Falco Products Co.*, 5 U.C.C.Rep.Serv. at 267; *In re Universal Medical Services, Inc.*, 8 U.C.C.Rep.Serv. at 617.

■ The rationale underlying such a conclusion is that a significant enough option

advantage to the benefit of the lessee almost insures a purchase election decision. *Naples*, at 348. Courts and commentators have characterized this as the "economic realities test," which provides that if at the end of the lease term the only sensible course economically for the lessee would be for him or her to exercise the option, the transaction is really a secured installment sale. *Matter of Fashion Optical, Ltd.*, 653 F.2d at 1389; *In re Fogelsong*, 88 B.R. 194, 196 (Bankr.C.D.Ill.1988); *In re Access Equipment, Inc.*, 62 B.R. 642, 646 (Bankr. D.Mass.1986); *White and Summers*. The question at bottom becomes whether the lessor has, in effect, at the end of the instrument's term, surrendered any claim to the residual value of the leased goods. *Naples*, at 348. *Accord, e.g., Leasing Service Corp. v. American Nat'l Bank & Trust Co.*, 19 U.C.C.Rep.Serv. at 260; *In re Loop Hosp. Partnership*, 35 B.R. at 936.

This rationale also underlies agreements containing no option to purchase, which might simply reflect an intent for title to pass with no additional consideration because the property is expected to have no market value at the expiration of the lease term. *See, e.g., In re Pacific Express, Inc.*, 780 F.2d at 1485. The salient factor, then, is the relationship of the amount paid towards the equipment over the life of the agreement to the property's fair market value at the end of the lease.

■ The agreement in dispute here calls upon the debtor/lessee to make 84 monthly payments of $8,355.00 to the lessor; thus $701,820.00 will have been paid at the end of the seven year term. The 1986 invoice of sale of this equipment to the lessor shows a sale price of $409,600.00.[8] Thus, at first blush it appears, as Bucks County

Bank argues, that Provident in effect lent $410,000.00 to the debtor for the purchase of this equipment, the sum to be repaid in 84 installments at roughly a 17% rate of return.

However, the issue of whether there exists residual ownership in the lessor must be addressed with an understanding of the equipment's fair market value at the end of the lease term. *Id.* The above argument presupposes that the useful life of the press is seven years; that is, that the fair market value of the press at the end of the lease term approaches zero. *See National Equipment Rental, Ltd. v. Priority Electronics Corp.*, 435 F.Supp. 236, 239 (E.D.N.Y.1977).

In this case, as it is the objector who desires to have the purported lease declared a security agreement, the burden of persuasion rests upon Bucks County Bank. Here, having heard no evidence as to the anticipated fair market value of the press at the conclusion of the lease term, I have no basis upon which to conclude that no residual value would exist in the property upon the conclusion of the contract. *In re Loop Hosp. Partnership*, 35 B.R. at 936 ("The Court cannot imply an option [where none exists] because the debtor has not established that its rental payments were intended to compensate the creditor for the equipment's fair market value in 1986, when the agreement would expire."). *See also In re Pacific Express, Inc.*, 780 F.2d at 1485 (where "lease" included no purchase option, "lessee" paid sums equivalent to original value plus interest, and evidence showed that the equipment would be rendered obsolescent by the end of the lease period, the transaction is that of an installment sale).[9] *Cf. Matter of Fashion Opti-*

8. As noted above, the press itself was sold as part of this bankruptcy in 1988 for, approximately, $180,000.00. No valuation testimony was offered.

9. The sole fact that the debtor was paying, in effect, 17 per cent interest on a purchase price does not, of itself, establish the existence of an agreement intended for security. No evidence was offered as to the lessor's cost of funds; moreover, at the time of contracting the debtor was in some economic straits, and was not in a

strong bargaining position. Thus, the 17 per cent interest payments arguably may have been intended to compensate the lessor for taking the risk of the transaction. *Compare Leasing Service Corp. v. American Nat'l Bank & Trust Co.*, 19 U.C.C.Rep.Serv. at 259–260, (court held that where no evidence of anticipated useful life of the equipment was presented and the contract contained no option to purchase, but where total rental payments exceeded the initial cost of the equipment by 37 per cent, no residual proprietary rights remained with the "lessor").

*cal, Ltd.,* 653 F.2d at 1390 (where instrument gave option to purchase at end of five years' term, option price fixed in terms of fair market value at end of term, but no evidence presented from which to infer such value, there was no way for court to tell whether the consideration requirement of section 1–201(37) has been contravened).

My reliance upon the significance of residual value is supported by the American Law Institute's recent approval of an addition to the UCC, "Article 2A–Leases." This article provides, *inter alia,* standardized provisions for drawing distinctions between true leases and those intended as secured transactions or sales. This in part is accomplished by an amendment to current UCC Section 1–201(37) "in order to re-assert the significance of residual value as the touchstone of the common law definition of a true lease." *Naples,* at 349 (criticizing courts' reliance on other factors). Specifically, Section 1–201(37) as amended would read as follows:

Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and

(a) the original term of the lease is equal to or greater than the remaining economic life of the goods;

(b) the lessee is bound to renew the lease for the remaining economic life of the goods, or is bound to become the owner of the goods;

(c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement; or

(d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

A transaction does not create a security interest merely because it provides that

(a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,

(b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording or registration fees, or service or maintenance costs with respect to the goods,

(c) the lessee has an option to renew the lease or to become the owner of the goods,

(d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or

(e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

For purposes of this subsection (37):

(x) Additional consideration is not nominal if (i) when the option to renew the lease is granted to the lessee the rent is stated to be the fair market rent for the use of the goods for the term of the renewal determined at the time the option is to be performed, or (ii) when the option to become the owner of the goods is granted to the lessee the price is stated to be the fair market value of the goods determined at the time the option is to be performed. Additional consideration is nominal if it is less than the lessee's reasonably predictable cost of performing under the lease agreement if the option is not exercised;

(y) "Reasonably predictable" and "remaining economic life of the goods" are to be determined with reference

to the facts and circumstances at the time the transaction is entered into; and

(z) "Present value" means the amount as of a date certain of one or more sums payable in the future, discounted to the date certain. The discount is determined by the interest rate specified by the parties if the rate is not manifestly unreasonable at the time the transaction is entered into; otherwise, the discount is determined by a commercially reasonable rate that takes into account the facts and circumstances of each case at the time the transaction was entered into.

1 *U.S.C.Serv. Secured Transactions* (MB) § 5C.04[3][c] at 5C-85-86.

██ I am cognizant of the fact that, as noted above, courts have earmarked a number of other factors which will indicate the existence of a security interest in the disguise of a lease.[10] These factors include whether the lessee is required to insure the items on behalf of the lessor for a value equal to the total rental payments; if risk of loss or damage is on the lessee; if lessee is to pay for taxes, repairs, damage and maintenance; whether there exist default provisions governing acceleration and resale; and whether the goods are fixtures impractical to remove. *See In re Loop Hosp. Partnership*, 35 B.R. at 935-936; *In re Tucker*, 34 B.R. 257, 261 (Bankr.W.D. Okla.1983). *See also In re Pacific Exp., Inc.* This list is not exhaustive; and not one factor alone conclusively creates a security agreement in the absence of an option. Instead, these decisions weigh these various factors and decide, looking at the totality of the objective facts, what the intent of the parties was. I find, however, that these factors are, at best, inconclusive of the issue as they can all legitimately appear in true leases. *In re Loop Hosp. Partnership*, 35 B.R. at 936; Burke, *An-*

*nual Survey–Secured Transactions*, 34 Business Lawyer 1547, 1550-51; *Naples*, 348-350; proposed amendment to UCC Section 1-201(37), *supra*. I agree that the "better indicator of intended ownership is the parties' anticipation of the fair market value at the end of the agreement." *In re Loop Hosp. Partnership*, 35 B.R. at 936.

Finally, then, as no evidence of the anticipated fair market value of the equipment at the end of the lease term was presented, I cannot conclude that the agreement is anything other than what it purports to be, a true lease of personal property.[11]

## IV.

Given my resolution of the first question, I need not address the second theory that the movant advances on its behalf.

An appropriate order shall be entered.[12]

## ORDER

AND NOW, this 13 day of January, 1989, upon consideration and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby ORDERED that the proceeds from the sale of the subject printing press currently held in escrow by Bucks County Bank be released by the Bank and paid to the movant, Provident Savings Bank.

---

**10.** The perhaps most detailed check-list is provided by *In re Brookside Drug Store, Inc.*, 3 B.R. 120 (Bankr.D.Conn.1980), where the court created a sixteen part test to aid its determination.

**11.** As the document signed by the parties is not ambiguous [*see also* N.T. at 33-35], the use of parol evidence in determining the intent of the

parties is inappropriate. *In re Duprat*, 28 B.R. 109, 111 (Bankr.D.Vt.1983).

**12.** This memorandum opinion constitutes the requisite findings and conclusions mandated by Bankr.R. 7052, 9014.