**In re CONTINENTAL AIRLINES, INC. et al., Debtors.**

**Bankruptcy Nos. 90–932 through 90–984. Civ. A. No. 91–58.**

United States District Court, D. Delaware.

March 26, 1991.

See also 932 F.2d 282.

Zack Clement, Houston, Tex., William Johnston, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for debtors.

Allen M. Terrell, Jr., Thomas L. Ambro, Richards, Layton & Finger, Wilmington, Del., for Equilease Associates Ltd. Partnership, et al.

Arthur G. Connolly, Henry S. Gallagher, Jr., Connolly, Bove, Lodge & Hutz, Wilmington, Del., Steven H. Reisberg, Willkie Farr & Gallagher, New York City, for Whirlpool Financial Corp.

## OPINION

GAWTHROP, District Judge.[1]

This is a consolidated appeal[2] from a bench opinion issued by the Honorable Helen S. Balick, Judge of the United States Bankruptcy Court for the District of Delaware, on January 30, 1991, in which Judge Balick ruled that creditors leasing aircraft equipment by "sale-leaseback" transactions are not entitled to rights under § 1110 of the bankruptcy code. 123 B.R. 713. *See* 11 U.S.C. § 1110. Appellants are creditors who lease aircraft under sale-leaseback leases to appellees and debtors, Continental Airlines, Inc., et al. Five other airlines— America West Airlines, Inc., American Airlines, Inc., Northwest Airlines, Inc., United Air Lines, Inc., and USAir, Inc.—as well as the American Association of Equipment Lessors—have filed as amicus curiae in support of the appellants' position. Appellants and amici urge this court to reverse the bankruptcy court and hold that leases resulting from sale-leaseback transactions are entitled to § 1110 protection. For the following reasons, I shall so hold.

## BACKGROUND

Continental Airlines, like other major airlines in the United States, holds a significant number of its aircraft by lease, and does so, in large part, by so-called "sale-leaseback" transactions. Airplane leases

---

1. Robert S. Gawthrop, III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

2. Sixty-one creditors took twelve separate appeals, (Nos. 91–58, 91–98 through 91–104, 91– 107 through 91–110, and 91–113). These appeals, which all raise the same legal question, were consolidated by the court, upon stipulation of counsel.

are generally of two types: (1) acquisition leases, under which an airline acquires aircraft for its fleet, and (2) non-acquisition leases, under which an airline sells aircraft from its existing fleet, and then leases the same aircraft back from the purchaser. These latter, widely used, sale-leaseback transactions, allow an airline to obtain operating capital, in exchange for a promise to pay a rental annuity. The annuity, combined with the residual value of the aircraft so leased, is calculated to bring the lessor a profit over the purchase price.

On December 3, 1990, Continental filed a voluntary petition in bankruptcy under Chapter 11. On January 16, 1991, Continental filed a motion before the bankruptcy court, asking the court to find that the leases that debtors hold under sale-leaseback transactions are not subject to § 1110 of the bankruptcy code.

Section 1110, in effect, exempts persons, who have specified interests in aircraft or aircraft equipment from the automatic stay of the bankruptcy code, which stay order attaches to a debtor's property upon the filing of a bankruptcy petition. *See* 11 U.S.C. § 362(a). The stay ordinarily prevents creditors from moving against any property of the debtor to recover on any debts owed, until granted permission to do so by the bankruptcy court. *Id.* Parties within the protection of § 1110, however, may repossess aircraft and aircraft equipment in which they have an interest, despite the automatic stay, if the debtor does not agree to pay all obligations and cure all

defaults within 60 days. By its terms, § 1110 protects "lessors", "conditional vendors", and parties with "purchase money equipment security interest[s]" (PMESIs).[3]

Continental sought authority from the bankruptcy court to cure defaults and meet obligations on various transactions that Continental determined to fall within § 1110. Payments due on these transactions total approximately $108 million. Continental did not seek similar authority to cure payments due under non-acquisition leases. Asserting that non-acquisition leases are not within § 1110, Continental seeks the continued use of aircraft so leased without having to pay the amounts now due on these leases, which totals approximately $58 million.

On January 30, 1990, after hearing oral argument from both parties, the bankruptcy court ruled that, unless non-acquisition leases are part of an acquisition package, they are not "leases" within the meaning of § 1110: i.e. only if an airline arranges to buy an aircraft, with the design of immediately selling it to, and leasing it back from, a financier, is the non-acquisition lease a "lease" within § 1110. *See* Tr. at 116 (Nos. 90–932 through 980, January 30, 1990). In reaching this conclusion, the bankruptcy court observed that the other transactions covered by § 1110—the PMESI and the conditional-sale contract—involve acquisitions. The court concluded that there was no basis for construing "lease" more broad-

---

**3.** Section 1110 provides in relevant part:

**Aircraft equipment and vessels**

(a) The right of a secured party with a purchase-money equipment security interest in, or of a lessor or conditional vendor of, whether as trustee or otherwise, aircraft, aircraft engines, propellers, appliances, or spare parts ... that are subject to a purchase-money equipment security interest granted by, leased to, or conditionally sold to, a debtor that is an air carrier ..., to take possession of such equipment in compliance with the provisions of a purchase-money equipment security agreement, lease, or conditional sale contract, as the case may be, is not affected by section 362 or 363 of this title or by any power of the court to enjoin such taking of possession, unless—

(1) before 60 days after the date of the order for relief under this chapter, the trustee, subject to the court's approval, agrees to perform all obligations of the debtor that become due on or after such date under such security agreement, lease, or conditional sale contract, as the case may be; and

(2) any default, other than a default of a kind specified in section 365(b)(2) of this title, under such security agreement, lease, or conditional sale contract, as the case may be—

(A) that occurred before such date is cured before the expiration of such 60–day period; and

(B) that occurs after such date is cured before the later of—

(i) 30 days after the date of such default; and

(ii) the expiration of such 60–day period.

ly than these related terms. *See id.*, at 115–116.

## DISCUSSION

### I. *Jurisdiction over Appeal*

Parties adversely affected by "final judgments, orders and decrees" of bankruptcy courts, may appeal, as of right, to the district court in the relevant jurisdiction. 28 U.S.C. § 158(a). Parties adversely affected by interlocutory orders may appeal by leave of court. *Id.* Continental argues that Judge Balick's order was not final, and that leave to appeal is inappropriate in this case. I do not address whether leave is appropriate, as I find that the order was final.

Since bankruptcy proceedings involve many parties and are frequently protracted, a strict finality requirement in the bankruptcy context, allowing appeal by right only after a reorganization plan is confirmed, could cause substantial waste of time and resources in particular cases. *See In re Amatex Corp.*, 755 F.2d 1034, 1039 (3rd Cir.1985). Thus, the Third Circuit has declared that courts faced with bankruptcy appeals should take a pragmatic approach to the finality requirement, and treat as final, orders that in other contexts might be considered interlocutory. *Walsh Trucking v. Insurance Co. of North America*, 838 F.2d 698, 701 (3rd Cir.1988).

 The factors to be considered in determining whether the order of a bankruptcy court is final include: the impact of the issue on the assets of the bankruptcy estate, the necessity for additional factfinding on remand, the preclusive effect of a decision on the merits of subsequent litigation, and the furtherance of judicial economy. *See Wheeling–Pittsburgh Steel Corp. v. McCune*, 836 F.2d 153, 158 (3rd Cir.1987) (citing *In re Meyertech*, 831 F.2d 410, 414 (3rd Cir.1987). The § 1110 issue pressed here is one of law, requires no factfinding, affects the distribution of $58 million from the bankruptcy estate, and,

when decided, will have preclusive effect on actions by future parties to sale-leaseback transactions.

Continental argues that the bankruptcy court's order, finding § 1110 not to apply to sale-leaseback transactions, is not final, because it merely postpones, rather than forecloses, the creditors' rights in their collateral. *See First American Bank of New York v. Century Glove, Inc.*, 64 B.R. 958, 959 (D.Del.1986). This is a mischaracterization. Section 1110 grants certain creditors the right to be free from the automatic stay of the bankruptcy code. The bankruptcy court's order in this case deprives appellants of these rights forever. Although the lessors retain rights in their property, these rights are fundamentally altered when subjected to the operation of the bankruptcy code. This is the essence of a final decision. This court has jurisdiction thereby.

### II. *Sale–Leaseback Transactions and § 1110*

The substantive issue before the court is solely one of statutory construction: whether the terms "lessor" and "lease" in § 1110 cover lessors who purchase from an airline the very aircraft or aircraft equipment that they lease back to the airline. Before addressing this question, it is important to note a related issue not being decided.

Under the Uniform Commercial Code, financing transactions denominated as leases, but designed to create security interests, are not treated as bona fide leases, but rather are treated as security agreements for sale. *See In re Aspen Impressions, Inc.*, 94 B.R. 861, 864 (Bankr.E.D.Pa. 1989) (citing § 1–207(37) of the U.C.C.). Continental has argued that many, if not all, of the sale-leaseback leases in question on this appeal are not bona fide leases but are properly characterized as security agreements for sale, and thus not entitled to protection under § 1110 as leases.[4] Fur-

---

4. Continental urges, in effect, that the word "lease" within § 1110 be read to include only "bona fide leases." Although the court is aware

of no cases so holding with respect to § 1110, there is case law holding that the word "lease" in other sections of the bankruptcy code in-

ther, Continental suggests that since these sale-leaseback transactions create security interests that are not "purchase-money equipment security interests", as that term is used in § 1110,[5] they are not subject to the protection of § 1110 at all.

However, this characterization issue, which Continental has vowed to press with respect to each of its non-acquisition leases, should it lose this appeal, is not now before me.[6] Here, I assume that the non-acquisition leases in question are bona fide leases, and thus address the legal question whether such leases are nevertheless outside the protection of § 1110, because they did not bring new airplanes to Continental's fleet.

Two courts have already written on this question, both finding that non-acquisition leases are covered by § 1110. *See In re Pan Am Corporation,* 125 B.R. 372 (S.D. N.Y.1991); *In re Braniff, Inc.,* 110 B.R. 980, 985 (Bankr.M.D.Fla.1990). These opinions are instructive. However, due to the importance of the question, and the difference of opinion from the court below, I will take a fresh look.

Continental asserts that the word "lease" in § 1110, when read in the context of surrounding words in the section, and in the light of the purposes of the bankruptcy code as a whole, can only be taken to include those "leases" that are designed to augment a carrier's fleet and equipment supply. Continental contends that this result is dictated by the principle of statutory construction known as *noscitur a sociis,* and by the legislative history behind § 1110. I shall address each in turn.

A. Noscitur A Sociis

*Noscitur a sociis* means, literally, that a thing may be known by its associates. In the context of statutory construction, it is invoked for the proposition that the mean-

ing of a word may be derived from the meaning of accompanying words. *See Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961); *see also Black's Law Dictionary* at 956 (5th Ed., 1979). This principle has been applied by the Supreme Court, *Jarecki,* 367 U.S. at 307, 81 S.Ct. at 1582, and recently by the Third Circuit. *Balley v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682 (3rd Cir.1991). Elsewhere the Supreme Court has expounded the similar principle that "words grouped in a list should be given related meaning". *See Massachusetts v. Morash,* 490 U.S. 107, 114–15, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1988); *see also Third National Bank v. Impac Limited, Inc.,* 432 U.S. 312, 322 and n. 16, 97 S.Ct. 2307, 2313 and n. 16, 53 L.Ed.2d 368 (1977) (equating *noscitur a sociis* with principle that grouped words are to be given related meaning).

Continental urges the court to apply *noscitur a sociis* to § 1110, and rule that "lease" means acquisition lease, because the other words in the list: "conditional sales" and "purchase money equipment security agreements" necessarily involve acquisitions. I find to the contrary that *noscitur a sociis* is no aid in this context.

Maxims of statutory construction are aids in ascertaining the plain meaning of a statute, not tools to contradict plain meaning. Simply because Congress places a word in a statutory list, does not mean that the word is intended to be treated like its fellows in all respects. Indeed, the Supreme Court has recognized that when words are grouped by the disjunctive "or", they are ordinarily to be given separate meaning. *See Garcia v. United States,* 469 U.S. 70, 73, 105 S.Ct. 479, 481, 83 L.Ed.2d 472 (1984). Because a word in a list "may have a character of its own not to be submerged by its association," *noscitur*

---

cludes only bona fide leases. *See In re PCH Associates,* 804 F.2d 193 (2nd Cir.1986) (addressing 11 U.S.C. §§ 365(d) and 502(b)(6)).

**5.** "Purchase money equipment security interest" is not defined in § 1110. The legislative history behind the section links this phrase to the concept as developed by the U.C.C. in § 9–107. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 240,

*reprinted in* 1978 U.S.Code & Adm.News at 5787, 6199. *See also* footnote 10.

**6.** Nor does the *in terrorem* intimation of Continental, regarding the incremental judicial labor that such a holding could engender, have any impact on the task of fairly and accurately construing the statute.

*a sociis* should be applied, as a general rule, only where the meaning of the word is "obscure" or "doubtful". *Russel Motor Car Co. v. United States,* 261 U.S. 514, 519, 43 S.Ct. 428, 430, 67 L.Ed. 778 (1923). *See also Jarecki,* 367 U.S. at 307, 81 S.Ct. at 1582 *and Balley,* 925 F.2d at 682 (*noscitur a sociis* is "wisely applied where a word is capable of many meanings").

The word "lease", as used in § 1110, suffers from no apparent ambiguity. Although a "lease" may arise in many contexts, the word is generally limited to specific transactions in property, under which an owner/lessor conveys property to a lessee for a term of years, in exchange for the lessee's promise to pay a fixed rent. *See generally Webster's Third New International Dictionary* at 1286 (1986). Sale-leaseback leases are leases within this definition. The fact that an airline sells a lessor an aircraft, before entering an agreement to lease the same aircraft back from the lessor, does not mean that the agreement is not a "lease", as the term is commonly understood. *See e.g. Frank Lyon Co. v. United States,* 435 U.S. 561, 581, 98 S.Ct. 1291, 1302, 55 L.Ed.2d 550 (1978) (taxpayer leasing building under sale-leaseback transaction is treated as owner/lessor under a standard lease transaction and is entitled to tax benefits from depreciation).

Continental points to no ambiguity inherent to the term "lease" as used in § 1110. Rather, Continental suggests that the meaning of lease must be restricted to avoid a clash with the meaning of the other two terms in the list. However, the fact that lease transactions need not involve new acquisitions, while conditional sales or PMESIs necessarily involve acquisitions, does not mean that the three terms were not intended to have their full and ordinary meaning. Indeed, absent clear indication to the contrary, the plain meaning of the terms controls. *See Demarest v. Manspeaker,* 498 U.S. ——, 111 S.Ct. 599, 112 L.Ed.2d 608, 616 (1991).

Continental relies on a number of cases where the Supreme Court applied *noscitur a sociis,* explicitly or implicitly, to restrict the meaning of a statutory term. *See Morash,* 490 U.S. at 107, 109 S.Ct. at 1668; *Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 105 S.Ct. 2458, 86 L.Ed.2d 1 (1985); *Third National Bank,* 432 U.S. at 312, 97 S.Ct. at 2307; *Jarecki,* 367 U.S. at 303, 81 S.Ct. at 1579. These cases are fact-specific, demonstrating circumstances where the principle of *noscitur a sociis* can be helpful to elucidate a statute's meaning, but adhering to no particular rule of thumb for its application. Having considered these cases separately and in some length, I find none to be apposite to the case at bar.

*Morash* and *Jarecki* illustrate the classic circumstance for the application of *noscitur a sociis:* in each, the language in question contained an ambiguity, or constructural conundrums, that could not be solved without reference to related words. In *Morash,* 490 U.S. at 107, 109 S.Ct. at 1668, the Court was called upon to decide whether policies of employers to pay employees for accrued but unused vacation days are "vacation benefit plans" within the meaning of § 3(1) of the Employee Retirement Income Security Act, (ERISA), *see* 29 U.S.C. § 1002(1). Section 3(1) provides that "any plan, fund, or program" maintained to provide "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or *vacation benefits,* apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services" are welfare benefit plans subject to ERISA's regulatory scope. *See* 11 U.S.C. § 1002(1) (emphasis added). Despite the specific inclusion of "vacation benefits" within the section, the Supreme Court held that vacation accrual plans "payable on a regular basis from the general assets of the employer" are not benefit plans subject to ERISA's requirements.

Looking to the characteristics of the other "listed" benefits, the Court determined that Congress intended to regulate only those plans which give an employee rights that are contingent on future occurrences, or which subject an employee to risks different from the normal employment risk. 490 U.S. at 116, 109 S.Ct. at 1673. In so

doing, the Court tacitly acknowledged that the term "vacation benefit plan", within the definition section of ERISA, could not be interpreted without reference to the other terms in that section. This is in marked contrast to the term "lease" as it appears in § 1110. "Vacation benefit plan" is a statutory construct, created by Congress to refer to a certain class of employee benefit plans. "Lease", on the other hand, is a word not invented by the bankruptcy code, and not dependent on the other provisions of the code for its meaning. Rather, it has a long history in the English language and in the common law.

The Court's opinion in *Jarecki*, 367 U.S. at 303, 81 S.Ct. at 1579, is similar. There, the Court was asked to address a section of the Excess Profits Tax Act of 1950, which excluded from the excise tax, "income resulting from exploration, discovery, or prospecting". *See* 367 U.S. at 305, 81 S.Ct. at 1581. A group of taxpayers asserted that the word "discovery" included the "discovery" or invention of new products. The Court disagreed, finding the term to be limited to income generated in the oil and gas and mining industries. 367 U.S. at 307, 81 S.Ct. at 1582. In doing so the court specifically recognized that "discovery" is a word capable of many meanings that could only be interpreted with reference to the surrounding terms "exploration" and "prospecting". *Id.*

The two other Supreme Court cases cited by Continental are distinguishable for other reasons. In *Schreiber v. Burlington Northern, Inc.*, 472 U.S. at 1, 105 S.Ct. at 2458, the Court considered whether the prohibition against "manipulative" practices in tender offers, contained in § 14(e) of the Williams Act, covers practices that artificially affect the price of stock, but which are fully disclosed. Section 14(e) prevents persons from engaging in "fraudulent, deceptive, or manipulative acts". Noting that "fraudulent" and "deceptive" acts both involve some element of misrepresentation, the Court read "manipulative" acts to require misrepresentation as well. *See* 472 U.S. at 8, 105 S.Ct. at 2462. At the same time, the court noted that this definition of "manipulative" was in accord with the word as used as a term of art in common law, and as defined in the dictionary. *See* 472 U.S. at 7, 105 S.Ct. at 2462. In short, although the Court referred to *noscitur a sociis* to strengthen its holding, it did so not to vary the plain meaning of the term, but to confirm it.

In *Third National Bank*, 432 U.S. at 312, 97 S.Ct. at 2307, the Court ruled that courts may preliminarily enjoin federal banks from foreclosing on mortgages, despite the language of 12 U.S.C. § 91, which states that no "attachment, injunction, or execution" may issue against a bank of the United States. The Court's holding limits the application of the statute to injunctions that would have the effect of seizing a bank's property, and is based, in part, on the Court's recognition that the writs of "attachment" and "execution", which "sandwich" the word "injunction" in the statute, are writs used by creditors to seize bank property, while the writ of garnishment, used by banks to move against the property of others, was "conspicuously absent" from the statute's terms. 432 U.S. at 322–23, 97 S.Ct. at 2314.

At first blush, the Court appears to be using *noscitur a sociis* to vary the meaning of a word—"injunction"—which is otherwise without ambiguity. However, this was an extraordinary case. Historical evidence before the Court suggested a reason for preventing creditors from obtaining injunctions against and seizing property from national banks, before a judgment is entered: viz. the threat of insolvency and the need to prevent creditors from gaining preferences. Yet the Court could find no "national or local" interest to be served in forbidding injunctions against national banks, preventing the banks themselves from moving against noncreditors. 432 U.S. at 323, 97 S.Ct. at 2314. Indeed, the Court found that if courts were not allowed to preliminarily enjoin aggressive actions by national banks, the only result would be to give these banks a "license to inflict irreparable injury against others." In short, the Court invoked *noscitur a sociis* to avoid an irrational reading of the statute.

Continental argues that a restrictive reading of § 1110—i.e. one that excludes non-acquisition leases—would further the public policy in favor or reorganization, which is embodied within the bankruptcy code. Nevertheless, Continental does not and cannot suggest that an expansive reading of § 1110 to cover non-acquisition leases is irrational. The policy question here concerns the trade-off of pre-bankruptcy benefits for post-bankruptcy burdens. If sale-leasebacks are afforded § 1110 protection, solvent airlines are benefitted with a means to obtain inexpensive financing, enabling them to upgrade operations and stave off insolvency during a credit crunch. At the same time, if the airline goes into bankruptcy, it will be faced with the obligation of having to make payments on the sale-leaseback leases if it wishes to keep operating the aircraft held under these leases. The national economic implications of this dynamic, while subject to debate, are not so clearly undesirable to require that § 1110 be read contrary to its literal terms.

In short, because the words "lease" and "lessor" in § 1110 are unrestricted and facially unambiguous, with a meaning fully ascertainable without reference to the related terms, the simple observation—that the lease is, in one respect, not like the conditional sale and the PMESI—is of no moment in ascertaining the plain meaning of these words. Nothing on the face of the statute suggests that each word in the grouping was not intended to have its clear ordinary meaning. Thus I turn to Continental's argument with respect to legislative history.

### B. Legislative History

#### 1. *Relevance to Interpretation of § 1110*

■ Review of legislative history is appropriate in interpreting a statute, even when the statutory language is professed to be plain on its face. *Watt v. Alaska*, 451 U.S. 259, 266, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981); *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434

(1976); *Smith v. Fidelity Consumer Discount Co.*, 898 F.2d 907, 910 (3rd Cir.1990); *Paskel v. Heckler*, 768 F.2d 540, 543 (3rd Cir.1985). This is not to say that plain language can be ignored. To the contrary, the words the legislature chooses are the most persuasive evidence of a statute's purpose and must be treated accordingly. *See Smith*, 898 F.2d at 910 (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S.Ct. 3245, 3249, 73 L.Ed.2d 973 (1982); *United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)). When the words are "clear and plain" a court must follow them, unless a literal reading produces results that are "demonstrably at odds with the intention of the drafters". *United States v. Ron Pair Enterprises*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989); *Smith*, 898 F.2d at 910.

■ The party who would vary the literal reading of a statute faces the heavy burden of demonstrating that the literal reading is demonstrably at odds with the legislative intent. *See Paskel*, 768 F.2d at 543. This burden is high because the statutory language, as the embodiment of the law, contains a significance not present in the words of legislative reports. Not only does Congress place more thought on the future implications of the actual language of a statute, *see Paskel*, 768 F.2d at 544, but that language is the guide by which citizens are expected to order their affairs.

Continental contends that this stringent standard does not apply here, because it is not attempting to vary the meaning of § 1110. Continental states that the meaning of the statute, properly understood, is that meaning suggested by application of the doctrine *noscitur a sociis*. While I have rejected the view that *noscitur a sociis* alone can be applied to vary the statute's literal meaning, I acknowledge that this principle may provide some support for Continental's claim if consistent with the legislative history. Nevertheless, this does not mean that Continental can create an ambiguity with *noscitur a sociis* when none otherwise exists. The heavy burden attaches whenever a party would vary the

literal reading of the statute. *Paskel,* 768 F.2d at 544. That a party can point to a maxim of statutory construction, to support a meaning other than the literal reading, is irrelevant.

Thus while I look to the legislative history, I bear in mind the limited purpose of the search. The question here is whether a literal reading of the statute to include non-acquisition leases produces a result "demonstrably at odds" with the legislators' intent, as manifest in the legislative history. *Ron Pair,* 489 U.S. at 242, 109 S.Ct. at 1031; *Smith,* 898 F.2d at 910.

### 2. *Historical Development*

#### a. Section 77(j)

Section 1110 of the current bankruptcy code has its origin in like provisions of previous codes. The first such provision, § 77(j), appeared in 1935, for the benefit of equipment financiers in the railroad industry. *See* Act of August 27, 1935, Pub.L. No. 74–381, ch. 774, 49 Stat. 911 (codified at 11 U.S.C. § 205(j), repealed). Amending the then existing law regarding the reorganization of railroads, Congress added a clause that exempts lessors and conditional vendors of rolling stock equipment from the court's power in bankruptcy to enjoin repossession of such equipment. *See id.*[7]

The purpose of this exemption, as articulated in the House Report accompanying the legislation, was to preserve the rights of trustees under "typical equipment trust agreement[s]", *see* H.R.Rep. No. 1283, 74th Cong., 1st Sess. at 4 (1935). Equipment trusts were financing devices used by the railroad industry in which trustees purchased equipment from a manufacturer, and then leased equipment to railroad companies. *See Black's Law Dictionary* at 482 (5th ed. 1979). The advantage of the equipment trust for financiers was that it gave the financier/trustee priority over claims to the equipment by holders of mortgages containing after-acquired equipment clauses.[8] However, before the passage of § 77(j), it was unclear whether the trustees' title in railroad equipment was also free from the powers of the bankruptcy court. There was case law at the time suggesting that the trust agreement should be treated, in reorganization proceedings, like a general mortgage. *See* H.R.Rep. No. 1283, 74th Cong, 1st Sess. at 4.

In deciding to resolve the doubt in favor of an exemption for equipment financiers, and in favor of the validity of the equipment trust "as a means of financing equipment purchases," the drafters of the house report noted the need to make equipment financing readily available

> ... at a time when the development of the transportation art is providing new forms of equipment, particularly in the passenger field, of which, in interests of efficiency and economy, the carriers should be able to avail themselves, and because, after a depression the carriers are usually required to make large expenditures for equipment in order to accommodate the improved traffic ...

*See id.,* at 4. The design of § 77(j) was thus to preserve for financiers and railroads, the benefits of an established form of financing equipment purchases. By preserving the financiers' rights to repossess equipment, § 77(j) provided low-cost financing for railroad equipment purchases.

---

**7.** Section 77(j) provides in relevant part, that: ... the judge may enjoin or stay the commencement or continuation of suits against the debtor until after final decree; and may, upon notice and for cause shown, enjoin or stay the commencement or continuance or any judicial proceeding to enforce any lien upon the estate until after final decree: Provided, ... [that] [t]he title of any owner, whether as trustee or otherwise, in rolling stock equipment leased or conditionally sold to the debtor, and any right of such owner to take possession of such property in compliance with the provisions of an such lease or conditional sale contract, shall not be affected by the provisions of this section.

**8.** The theory behind the trustee's priority is not entirely clear. Under both leases and conditional sales the lender retains title to the equipment. Since the equipment thus does not become property of the railroad, it is isolated from general mortgages thereon. However, it also appears that equipment financiers could obtain priority over general mortgages simply by virtue of having a purchase-money claim. *See generally* 2 Gilmore, *Security Interests in Personal Property,* § 28.2 at 748.

### b. Section 116(5)

In 1957, Congress added a similar clause to the bankruptcy code to encourage equipment financing in the airline industry. *See* Act of September 4, 1957, Pub.L. No. 85–295, ch. 681, 71 Stat. 617, *reprinted in* 1957 U.S.Code Cong. & Admin.News 681 (codified at 11 U.S.C. § 516(5), repealed). Section 116(5) rendered the then-existing provisions of Chapter X, and the court's power to issue injunctions thereunder, inapplicable to property claims of lessors and conditional vendors of certain aircraft equipment.[9]

The house report accompanying this amendment likened § 116(5) to § 77(j), and "contemplated" that the enactment of § 116(5) would "result in extensive use of equipment trust financing as the financial basis for a major reequipment program [in the airline industry]." *See* H.R.Rep. No. 944, 85th Cong., 1st Sess. at 2 (1957), *reprinted in* 1957 U.S.Code Cong. & Admin. News 1926, 1927. The report also noted testimony before the house judiciary committee, which established that "smaller [air]lines" were having trouble attracting capital for reequipment requirements, and that enactment of § 116(5) would increase the availability of capital at lower rates of interest, due to the "greater security" thereby provided to lessors and conditional vendors. The report thus suggested that in enacting § 116(5), Congress was concerned with encouraging a financial climate in the airline industry that would allow carriers to obtain financing to acquire new aircraft and equipment.

In 1968, Congress enacted a similar provision, § 116(6), to aid financing in the shipping industry. *See* Act of October 17, 1968, Pub.L. No. 90–586, 82 Stat. 1149, *reprinted in* 1968 U.S.Code Cong. & Admin.News 1322 (codified at 11 U.S.C. § 516(6), repealed). The house report accompanying this legislation noted that both the railroads and airlines already had "equipment trust" financing, which were exempt from the operations of the bankruptcy code. H.R.Rep. No. 1932, 90th Cong., 2nd Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Admin.News 4279.

### c. Section 1110

In 1978, when Congress passed an entirely new bankruptcy code, the protection afforded lessors and conditional vendors in §§ 77(j), 116(5) and 116(6) of the old code, were in large part retained. *See* 11 U.S.C. § 1168 (railroads) and 11 U.S.C. § 1110 (shipping and airlines). Two important changes, however, were made. Under §§ 1168 and 1110, parties holding PMESIs are added to the protected class, and all parties with protected interests are required to wait 60 days, in which the airline can move to cure defaults, before moving to repossess.

In addressing the new transportation equipment exceptions, the drafters of the 1978 house report first summarized the old, stating that the railroad exemption was originally enacted to "protect a form of financing that had obtained in the rail industry for several decades before the enactment of the first railroad reorganization provision", while the airplane and ship exemptions were enacted to "encourage[ ] new financing in the relevant industries." *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. at 239 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6198. The drafters also explained that the old provisions exempted only "leases and conditional sales" on the theory that under these transactions "title of the property does not pass to the debtor, but remains in the financier". Where property is not part of the debtor's estate, the report states, "it is appropriate to exclude [it] from the automatic stay in a reorganization case". *Id.* at 240, *reprinted*

---

**9.** Section 116(5) provided, with citations omitted, that:

Notwithstanding any other provisions of chapter X, the title of any owner, whether as trustee or otherwise, to aircraft, aircraft engines, propellers, appliances and spare parts ... leased, sub-leased or conditionally sold to any air carrier ... and any right of such owner or of any other lessor to such air carrier to take possession of such property in compliance with the provisions of any such lease or conditional sale contract shall not be affected by the provisions of chapter X if the terms of such lease or conditional sale so provide.

*in* 1978 U.S.Code Cong. & Admin.News at 6199.

The report suggests that Congress retained the old provisions, not so much to reaffirm their initial purposes, as to preserve a system of financing to which the industry had grown accustomed. "Whether or not there was an initial need for these provisions," the report states, "their existence has become largely addicting to the financing industry, and now the industry claims it would simply cease financing of the relevant equipment if the protections were removed." *Id.* at 239, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6198.

While thus acceding to the industry's desire that the exemptions remain, Congress did see a need to soften their impact and modernize their effect. Noting that the absolute exemptions were "harsh in ... application", the drafters of the house report explained that the 60–day grace period was to take the edge off the old provisions, and "accommodates the joint interests of the equipment financiers and ... the reorganization process". *Id.* at 239, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6198. The drafters further explained that the PMESI was included within the exemption to avoid having financing transactions "unnecessarily force[d] ... into outmoded forms," and to accommodate new forms of equipment financing "more consonant with modern law". *Id.* at 240, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6200. The report, however, is careful to state that the addition of "equipment security interest[s]" included "only security interests that were granted to finance the acquisition of the covered equipment" and excluded "general mortgage[s]". *Id.* at 240, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6199.[10]

### 3. *Interpretation*

In summary, the legislative history behind § 1110 reveals the following: The notion of an equipment financing exemption was first adopted into law in the railroad industry, in § 77(j), to preserve for financiers the benefits of what was known as "equipment-trust financing", because the availability of such financing would provide inexpensive capital to railroads, allowing them to reequip and begin to pull out of the Great Depression. H.R.Rep. No. 1283 at 4. Congress later extended the exemption to the airline industry, in § 116(5), to bring equipment trust financing to air carriers, and particularly to aid "smaller" carriers in obtaining capital to reequip their fleets. H.R.Rep. No. 944 at 2, *reprinted in* 1957 U.S.Code Cong. & Admin.News at 1926. Congress made these exemptions applicable to leases and conditional sales, on the theory that when title remains with the creditor, as when equipment is leased or sold conditionally, the property is not properly part of the debtor's estate when reor-

---

**10.** Because the parties disagree as to the precise meaning of this portion of the legislative history, I reproduce it at length:

An attempt was made to preserve the limitations on the right of the financier contained in current law. However, certain changes were made. First, the proposed sections provide protection for equipment security interests. The term includes only security interests that were granted to finance the acquisition of the covered equipment. A general mortgage is excluded. Under present law, the protection applies only to leases and conditional sales of equipment. The theory behind the present limitation is that under leases and conditional sales, title of the property does not pass to the debtor, but remains in the financier. Thus, it is appropriate to exclude what is not property of the estate from the automatic stay in a reorganization case.

Changes in financing practices and in the bankruptcy laws have suggested that the for-

mer limitation be deleted, and that the protection be expanded to cover equipment security interests. Since the adoption of the original sections, there has been universal adoption of Article 9 of the Uniform Commercial Code, which abolishes conditional sales contracts, and substitutes security agreements and security interests instead. changes in the bankruptcy laws provide similar restraints for lessors of property to the debtor as exist for mortgages of secured creditors. Indeed, the Uniform commercial code acknowledges that some leases are merely disguised security agreements, and directs that they be so treated. Because retention of the prior limitation would unnecessarily force equipment financing into outmoded forms, protection of security interests was added to make financing forms more flexible and more consonant with modern law.

ganization is attempted. H.R.Rep. No. 595 at 240, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6199.

Congress continued the protection provided by § 116(5) when enacting § 1110. Congress did so in apparent acquiescence to the financing industry's "addiction" to equipment trust financing. *Id.* at 239, *reprinted in* 1978 U.S.Code Cong. & Admin. News at 6198. Congress added PMESIs to the list of protected transactions, despite the fact that the holders of such interests do not hold title to the secured property, because conditional sales, under modern commercial law, have been discredited in favor of the PMESI. *Id.* at 240, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6199. In adding security interests to the protected category, Congress was careful to include only purchase money interests, and not general mortgages.

To interpret the legislative history of § 1110, Continental focuses on the fact that leases and conditional sales, and equipment-trust financing in general, were the means by which carriers traditionally acquired new equipment. Continental further notes Congress's design to include, within the protection of § 1110, the modern form of acquisition financing—transactions creating purchase money security interests—while excluding general mortgage financing, aimed at raising operating capital. From this Continental gleans a Congressional intent to include only acquisition financing in the exemption, and to exclude lease transactions that do not bring new equipment to an airline, but which are used instead to bring in operating capital.

I agree that the legislative history demonstrates that Congress was concerned with facilitating acquisition financing. However, I am unable to also find that Congress was concerned only with facilitating acquisition financing, and intended § 1110 to be so limited. The legislative reports from § 1110 and its predecessors contain various remarks regarding the encouragement of financing in general. The legislative reports also show that Congress favored inexpensive financing, at least in

part, because it would promote acquisition of new equipment and modernization within the transportation industries. However, Continental has pointed to no statements, in any of the predecessor statutes or the accompanying legislative reports, that manifest a Congressional desire to limit the exemption for lease financing to the goal of promoting acquisitions.

Continental contends that this function is performed by the phrase from the 1978 report, in which the drafters assert that: "A general mortgage is excluded". *Id.*, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6199. However, this comment was made in the discussion of the addition of security interests to the airplane equipment exemption, and was apparently used to distinguish common security interests from purchase money security interests.[11] Further, even if this comment is read more broadly, it does not mean that non-acquisition leases must be excluded from the protection of § 1110. Continental argues for such a result by analogizing non-acquisition leases to general mortgage financing. Yet a mortgage is not a lease. It is one thing to say that mortgages are excluded, and quite another to say that all transactions behaving like mortgages are excluded. There is nothing in the legislative history asserting the latter. Indeed, the house report to § 1110 notes that the exemptions are based on a title theory, which applies whether or not the lease is an acquisition lease.

Further, the inclusion of non-acquisition leases within the exemption can be seen to be consonant with the legislative goal of encouraging acquisitions. While non-acquisition leases do not directly result in new aircraft or equipment for a carrier, the conversion of ownership interests in existing aircraft to leasehold interests, frees up capital that an airline can use to facilitate the acquisition of such aircraft. *See Pan Am*, 125 B.R. 372, 375.

In so noting, I recognize that the equipment financing exemption in § 1110 is at cross purposes with the automatic stay in

**11.** *See* footnote 10.

§ 362(a). As § 1110 is read more broadly, the size of the debtors' estate protected for reorganization by § 362(a) is narrowed. Since parts or sections of statutes are not to be read in isolation, but in view of the statute as a whole, *see United States v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984), it is axiomatic that statutory exemptions should not be read to emasculate the provisions that they vary. On the other hand, the inclusion of non-acquisition leases within § 1110 diminishes the protections of the automatic stay, not generally, but only in the airline and shipping industries. Congress certainly knew that the inclusion of equipment leases within § 1110 would limit the resources available for airlines during reorganization. That Congress nevertheless failed to restrict the type of leases exempted, and failed to suggest a need for such restriction in legislative reports, is evidence that Congress meant what it said.[12]

The legislative history demonstrates that Congress had a goal of encouraging equipment financing in the airline industry. Under the terms of § 1110, Congress chose to exempt equipment leases, without exception, from the automatic stay, as a means to achieve this goal. Continental argues that the goal would be better served if only acquisition leases were exempted. Yet it can also be argued that Congressional purposes would be better achieved if the exemption were limited to acquisition leases on new equipment, excluding leases acquiring older aircraft, because Congress was concerned with modernization. Likewise, it can be argued that the exemption should be limited to persons leasing to "smaller carriers", because Congress only specifically identified these carriers as having trouble obtaining financing. In short, there are numerous ways Congress could have written § 1110 in order to further its apparent goal. However, the judicial task is to give effect to what Congress actually did.

 Since the legislative history here does not demonstrate a Congressional purpose at odds with a literal reading of the statute, I am compelled to find that Congress meant what it said, and hold that non-acquisition leases are entitled to § 1110 protection.

---

12. Congress's knowledge of the use of sale-leaseback transactions in the transportation industries is not certain. Sale-leaseback transactions, however, are not new to the financing industry. *See e.g. Yorkshire Ry. Wagon Co. v. Maclure,* 21 Ch.D. 309, 51 L.J.Ch. 857, 47 L.T. 290, 10 Digest (Rept.) 756 (1882) (addressing sale leaseback of "locomotives and wagons"); *Brodsky v. Perth Amboy National Bank,* 259 F.2d 705 (3rd Cir. 1958) (addressing sale leaseback on real property); *see also Sun Oil Co. v. C.I.R.,* 562 F.2d 258, 268–69 (3rd Cir.1977) (recognizing that "sale-leaseback arrangements play a useful and accepted role in our economy"). In construing a statute, courts may look to the conditions of the times when it was passed. *See Stern v. United States Gypsum,* 547 F.2d 1329, 1335 (7th Cir. 1977). Legislators are presumed to have knowledge of those conditions. *See Crosby v. United States,* 8 Cl.Ct. 428 (1985). That sale-leaseback transactions were used in and prior to 1978, and Congress did not act to exclude them from the coverage of § 1110, is evidence that Congress intended them to be included.